Ileana **IRVINE, IRG Research Group, Inc.**, Plaintiffs, Appellees,

v.

**MURAD SKIN RESEARCH LABORATORIES, INC.,** Defendant, Appellant.

No. 98–1595.

United States Court of Appeals, First Circuit.

Heard March 3, 1999.

Decided Nov. 15, 1999.

Vincent J. Syracuse, with whom Newman Tannenbaum Helpern Syracuse & Hirschtritt LLP, David A. Pellegrino and Luis N. Blanco–Matos were on brief, for appellant.

Jossie Yunque–López and Raúl González–Toro, for appellees.

Before TORRUELLA, Chief Judge, SELYA, Circuit Judge, and ACOSTA,[*] Senior District Judge.

## AMENDED OPINION

ACOSTA, Senior District Judge.

On appeal defendant-appellant Murad Skin Research Laboratories, Inc. ("Murad") challenges the verdict rendered in favor of both plaintiffs IRG RESEARCH GROUP, INC. ("IRG") and Ileana Irvine ("Irvine"). Specifically, Murad alleges that the district court erred by (1) not granting its motion for judgment as a matter of law; (2) declining to charge the jury in accordance with its proffered instruction on foreseeability; (3) denying its petition

[*] Of the District of Puerto Rico, sitting by designation.

for a new trial; and (4) allowing the testimony of plaintiffs' expert witness.

On review we agree with Murad's reasoning that it is entitled to a new trial vis-à-vis IRG, and that Irvine's individual claim should have been dismissed as a matter of law.

## BACKGROUND

Murad is a stateside manufacturer of skin care products. Irvine and her daughter, Catherine Irvine Sarnataro, both "aestheticians," i.e. skin care specialists, first came in contact with the Murad line of products at a trade show in Chicago in 1989. Irvine testified at trial that there was a "glycolic acid revolution" in the industry at the time and she found the glycolic acid manufactured by Murad to be the "most effective" of all the other products available in the market. Initially, she purchased Murad products for her own clients but since 1991 she also sold them to various salons.

Subsequently, Irvine and her daughter met periodically with Dr. Howard Murad, president of Murad, at various conferences and conveyed to him an interest in becoming the exclusive distributor of Murad products in Puerto Rico. The conversations culminated in a provisional exclusive distribution agreement dated September 2, 1993 with IRG, a corporation established and controlled by Irvine and her daughter. The contract would be extended after December 1994 conditioned upon IRG meeting certain sales quotas.

Both Irvine and her daughter testified regarding their efforts on behalf of IRG to develop a market for the Murad skin products in Puerto Rico which included promotions, advertisements, demonstrations, training and education of both aestheticians and dermatologists. IRG operated through its own clinics and also sold to aestheticians and medical offices.

In May 1994 Murad broadcast an infomercial on various stateside cable television stations as part of its advertising campaign. Dr. Murad testified that the purpose behind the infomercial was to expose their home products to customers and also to lure them into the salons for professional treatment. Unbeknown to Murad, a New York station relayed the infomercial to Puerto Rico and its products were thereby made available locally through telemarketing.

According to plaintiffs-appellees, the infomercial marked the beginning of the economic downfall of both IRG and Irvine. After IRG learned of the telemarketing incursion, it sought relief under the Puerto Rico Distributorship Act, Law 75 of June 24, 1964, P.R. Laws Ann. tit. 10 § 278 *et seq.* (1997) whereas Irvine sued under the local torts statute. The jury found for plaintiffs-appellees and awarded $390,000 to IRG and $100,000 to Irvine as damages.

## RULE 50

■ Petitions for judgments as a matter of law under Rule 50(a)(1) Fed.R.Civ.P. will be granted only in those instances where, after having examined the evidence as well as all permissible inferences drawn therefrom in the light most favorable to non-movant, the court finds that a reasonable jury could not render a verdict in that party's favor. *Wills v. Brown Univ.,* 184 F.3d 20, 28 (1st Cir.1999); *Mangla v. Brown Univ.,* 135 F.3d 80, 82 (1st Cir. 1998); *Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d 252, 261 (1st Cir. 1997); *Bogosian v. Mercedes–Benz of N. Am., Inc.,* 104 F.3d 472, 475 (1st Cir.1997); *Speen v. Crown Clothing Corp.,* 102 F.3d 625, 628 (1st Cir.1996), *cert. denied,* 520 U.S. 1276, 117 S.Ct. 2457, 138 L.Ed.2d 214 (1997). In carrying out this analysis the court may not take into account the credibility of witnesses, resolve evidentiary conflicts, nor ponder the weight of the evidence introduced at trial. *Ramos v. Davis & Geck, Inc.,* 167 F.3d 727, 731 (1st Cir. 1999); *Alvarez–Fonseca v. Pepsi Cola Bottling Co. of P.R.,* 152 F.3d 17, 23 (1st Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1778, 143 L.Ed.2d 806 (1999); *Logue*

*v. Dore*, 103 F.3d 1040, 1043 (1st Cir.1997); *Speen*, 102 F.3d at 637; *Katz v. City Metal Co., Inc.*, 87 F.3d 26, 28 (1st Cir.1996).

 In order to overcome a Rule 50 petition the party carrying the burden of proof must have introduced at trial sufficiently adequate evidence for the jury to determine the plausibility of a particular fact. "Thus, in order to support a jury finding on such an issue, the evidence presented must make the existence of the fact to be inferred more probable than its non-existence." *Alvarez–Fonseca*, 152 F.3d at 24; *Katz*, 87 F.3d at 28; *Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d 19, 22 (1st Cir.1992); *Malave–Felix v. Volvo Car Corp.*, 946 F.2d 967, 971 (1st Cir.1991).

 A mere scintilla of evidence will not rise to a triable issue of fact necessary to avoid dismissal under Rule 50. *Crane v. Green & Freedman Baking Co., Inc.*, 134 F.3d 17, 21 (1st Cir.1998); *Ed Peters Jewelry*, 124 F.3d at 261; *Coyante v. P.R. Ports Auth.*, 105 F.3d 17, 21 (1st Cir.1997); *Speen*, 102 F.3d at 637. Nor will "conjecture" or "speculation" over the evidence presented provide sufficient grounds to warrant a fact finding determination by the jury. *Russo v. Baxter Healthcare Corp.*, 140 F.3d 6, 8 (1st Cir.1998) (citing *Katz v. City Metal Co.*, 87 F.3d at 28).

 On appeal we will review the record *de novo* employing the same criteria applicable to the trial court, and decide whether, as defendant/appellant contends, the jury in this case "as a rational factfinder could have reached no conclusion except that the plaintiff[s] take nothing." *Logue v. Dore*, 103 F.3d at 1043. *See also Sheils Title Co., Inc. v. Commonwealth Land Title Ins. Co.*, 184 F.3d 10, 17 (1st Cir.1999); *Russo*, 140 F.3d at 8; *Speen*, 102 F.3d at 628; *Katz*, 87 F.3d at 28.

## NEW TRIAL

 The *nisi prius* court's denial of a petition for new trial will be overturned only for abuse of discretion. A new trial is warranted only in those situations where the verdict is contrary to the clear weight of the evidence introduced at trial and its ratification would result in a miscarriage of justice. *Sheils Title Co.*, 184 F.3d at 17; *Ramos*, 167 F.3d at 731; *Bogosian*, 104 F.3d at 482.

## LAW 75

### Generally

Puerto Rico's Law 75 governs the business relationship between principals and the locally appointed distributors/dealers for marketing their products. The statute was initially enacted to avoid the inequity of arbitrary termination of distribution relationships once the designated dealer had successfully developed a local market for the principal's products and/or services. *Sheils Title Co.*, 184 F.3d at 14; *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 870 (1st Cir.1998); *Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo, Inc.*, 96 F.3d 10, 14 (1st Cir.1996); *R.W. Intern. Corp. v. Welch Foods, Inc.*, 88 F.3d 49, 51 (1st Cir.1996). In order to accomplish its goal Law 75 limited the principal's ability to end the relationship unilaterally except for "just cause," § 278a, while subjecting the principal to considerable economic liability for unjustifiable terminations. *See* § 278b of Law 75 (enumerating factors to consider in calculating award).

In 1966 the protection afforded to dealers under Law 75 was extended to include the conduct of a principal which even though it did not end the contract [1] it was

---

1. P.R. Laws Ann. tit. 10, § 278a (1997) reads: Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act **detrimental** to the established relationship or refuse to renew said contract on its normal expiration, except for just cause. (Emphasis ours).

**318**

deemed detrimental[2] to the distribution relationship. The amendment further provided that impairments without just cause would subject the infringing party to the same liability provided for terminations under § 278b.

### Impairment

Law 75 enumerates some instances of impairment by way of illustration[3] and establishes a rebuttable presumption of impairment whenever a principal bypasses a dealer by distributing merchandise directly; appoints additional dealers in contravention of the agreement; fails to adequately fill orders; or arbitrarily changes the transportation and/or payment terms. § 278a–1(b)(1)–(4).

■ The protection afforded dealers by Law 75, however, is circumscribed by those rights acquired under the agreement regulating their business relationship. Therefore, whether or not an impairment has taken place will depend upon the specific terms of the distribution contract.

The question whether there has been a "detriment" to the existing relationship between supplier and dealer is just another way of asking whether the terms of the contract existing between the parties have been impaired. *Vulcan Tools of P.R. v. Makita USA, Inc.*, 23 F.3d 564, 569 (1st Cir.1994).

The parties do not dispute the fact that, pursuant to the agreement dated September 2, 1993, IRG had the exclusive distribution rights of Murad products in Puerto Rico during a trial period lasting from August 25, 1993 through December 31, 1994.[4] Further, the document provided

that should IRG meet a particular sales quota it would qualify to act as Murad's exclusive distributor for an additional two years.

It is also uncontested that through its infomercial, which commenced airing in Puerto Rico in May 1994, Murad sold its products directly to local clientele. The uncontroverted evidence at trial also established that Murad never intended the broadcast to be aired in Puerto Rico. This was a fortuitous event brought about by cable carriers not related to Murad in any way.

Murad argues that it is not liable for impairment of the relationship because once notified by plaintiffs-appellees of the broadcast in Puerto Rico it promptly gave instructions for this sales mode to be discontinued.

■ A principal may not be held accountable for unknown market interference by third parties. However, once put on notice that its products are reaching an area of limited distribution rights a principal has the obligation to take prompt positive action to curtail the practice. Even though its role was not to "stand as a vigilant dog", *Gen. Office Prod. Corp. v. Gussco Mfg., Inc.*, 666 F.Supp. 328, 333 (D.P.R.1987), once informed of the local transmission Murad did have an affirmative duty to ensure that the direct sales would cease and avoid further interference with the Puerto Rico market.

■ Murad argues that it was alerted to the local transmission of the broadcast "for the first time" via a letter dated Octo-

**2.** The term "detrimental" which appears in the English version of the statute is a translation for "menoscabo" which also means " 'impairment,' 'diminution,' 'deterioration,' or 'undermining.' " *A.M. Capen's Co., Inc. v. Am. Trading and Prod. Corp.*, 973 F.Supp. 247, 260 n. 12 (D.P.R.1997).

**3.** The Report of Committee on Industry and Commerce, House of Representatives, IV *Servicios Legislativos* 637–38 (1966), concedes

that it would be impossible to enumerate all acts constituting impairment.

**4.** The document provides that defendant/appellant "will not sell Murad branded products in Puerto Rico thru any organization other than IRG" during the particular time period. Although Murad argued at trial that this clause did not preclude direct sales to individual consumers, this issue was not developed on appeal.

ber 14, 1994 forwarded by Catherine Irvine (Appellant's brief at 6) and that it immediately responded by taking steps to avoid its recurrence. However, there is enough information in the record from which a reasonable jury could infer that Murad was advised of the broadcast much earlier than October 14, 1994.

At trial Dr. Murad acknowledged having been informed of the broadcast matter "a few weeks before" receiving the October 14, 1994 letter. Further, this correspondence makes reference to a request made by IRG "[a]bout a month ago" for a list of local customers who had placed orders through the infomercial which presupposes Murad had been notified of this practice long before the letter was mailed. The letter also points to an earlier telephone call by Gerard Sarnataro, Catherine Irvine's husband, on behalf of IRG "several days ago" notifying of direct orders placed by him and others. Lastly, the letter was a follow-up to a prior conversation between Catherine Irvine and Dr. Murad demanding some kind of response from Murad which again proves earlier contacts regarding the prohibited availability of Murad products through the infomercial.

Irvine also testified that she, her daughter and son-in-law "started feeling the negative effects" of the infomercial in the summer of 1994. She related how customers and beauty salon owners complained to her that the products were being made available through the television at lower prices. Irvine further indicated that she, her daughter and her son-in-law "immediately got in touch with Mr. Angelo Fiorita," Murad's representative, to express their concern (emphasis ours) and that Mr. Fiorita responded that he would "speak with Dr. Murad and ... take the necessary steps for this to stop happening.". However, according to Irvine's testimony, "[n]othing happened." Irvine explained that the October 1994 letter was eventually

sent to Murad because the situation continued to worsen without any corrective measures being taken by Murad.

Gerard Sarnataro testified that he placed orders from Puerto Rico "several times to test out" how long Murad would continue the practice of selling the products directly in the local market. Mr. Sarnataro further indicated that he continued purchasing products from Puerto Rico and calling Murad to object to what he considered an unauthorized practice. At trial Mr. Sarnataro also described how, despite his complaints, approximately two months later he had been approached over the telephone to inquire if he was interested in reordering Murad's products.

Murad's first remedial action was taken on October 25, 1994.[5] Because the jury could logically infer that Murad was put on notice of the interference soon after May 1994 Murad's argument that it responded diligently is undermined by the evidence in the record. Therefore, a reasonable fact finder could have found that the exclusive distribution provision of the contract had been impaired by Murad's failure to take prompt positive action in reacting to IRG's complaints. However, our analysis under Law 75 does not conclude here.

### Damages

Law 75 establishes a formula for the indemnification of dealers/distributors in the event of either termination or impairment to the relationship by a principal without just cause. However, Law 75 specifically limits payment "to the extent of the damages caused [the dealer/distributor]" § 278b (emphasis ours). It is clear from reading this provision that damages will not be automatically conferred in all cases of termination and/or impairment. In this regard the Puerto Rico Supreme Court specifically held in *Marina Indus., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 90, 1983 WL 204219 (1983) that the factors

---

5. A memorandum was forwarded to Murad's sales personnel on October 25, 1994 advising that "effective immediately" the entity han-

dling the calls originating from the infomercial would no longer take orders from Puerto Rico and would be referred to IRG instead.

enumerated in § 278b are not mandatory. Rather, they constitute guidelines to be utilized contingent upon the presentation of adequate proof in each case. Further, in *Marina Industrial* the Supreme Court acknowledged that evidence of damages is an essential element of a Law 75 violation as to which plaintiff bears the burden of proof. Therefore, in order to prevail, a Law 75 plaintiff must submit evidence of damages as part of its action.

A claim for impermissible termination or impairment of a dealership contract under section 278 has two essential elements; that the contract existing between the parties was impaired or terminated without just cause and that there were resulting damages. After the plaintiff has shown an impairment or termination of the contract, the defendant may offer the affirmative defense of just cause. If there was no just cause, the plaintiff must show damages. *Draft–Line Corp. v. Hon Co.*, 781 F.Supp. 841, 843 (D.P.R.1991) *aff'd*, 983 F.2d 1046 (1st Cir.1993) (unpublished table decision).

The jury awarded IRG $390,000 as damages under Law 75. Murad argues that it is entitled to a new trial because the award was based on the testimony of IRG's expert witness who relied on unsubstantiated facts for rendering his opinion.

The opinion rendered by plaintiffs' expert to justify IRG's damages was based on a formula using the ratio between the number of clinics opened by IRG and the corresponding volume of sales. The expert then proceeded to make a projection of the anticipated sales of IRG had it opened 25 clinics within a term of five years as originally planned.

■■■ Murad argues the district court should have stricken the testimony of the accountant regarding IRG's economic losses as unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because the expert's opinion was purportedly based on erroneous factual information. In *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) the Supreme Court explained that the presiding judge's role as "gatekeeper" in ensuring the reliability and relevancy of expert testimony as discussed in *Daubert* extends to opinions in both scientific and non-scientific fields. However, the trial court has ample discretion in devising the appropriate criteria for its determination on a case by case basis. "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire*, 119 S.Ct. at 1175. Further, this "same kind of latitude" will be afforded to the judge in selecting the procedure to be utilized for the inquiry. *Id.* A trial court's decision to exclude or admit expert testimony will be only be reversed for abuse of discretion. *Id.* at 1171.

■■■ On appeal Murad points to alleged inaccuracies in the underlying facts utilized by the expert in reaching his conclusions, which according to defendant-appellant render his assessment of IRG's damages unreliable. In particular, Murad claims that the accountant utilized incorrect sales data in determining the losses attributed to the alleged impairment. According to the expert, IRG's net income from Murad sales and services for the fiscal year ending in July 1994 amounted to $71,468.[6]

The accountant testified that "the net income from the sales and services related to the Murad product, which was the whole operation of IRG, were $71,468 [for fiscal year 1994]." These computations were based on the assumption that Murad products represented 100% of IRG sales of products and services throughout the en-

---

**6.** This sum, multiplied five times pursuant to P.R. Laws Ann. title 10, § 278b(d), represented $357,340 in damages under Law 75. Additionally, the accountant valued IRG's goodwill at $3,572,492 for Law 75 purposes.

tire year. The expert indicated that the percentage utilized by him in rendering his opinion was based exclusively on the representations made by IRG management. He did not examine any documents pertaining to IRG's purchases or sales to verify the accuracy of this information.

However, during the first two months utilized by the accountant in determining IRG's net income Murad products represented only a small fraction of its sales. This is confirmed in a letter dated August 23, 1993 wherein IRG indicated to Murad that gross sales of Murad products "has been at under 20%" and projected an increase to "40% of the gross product sales being Murad products."

IRG has attempted to down play the relevance of this information arguing that the August 23, 1993 correspondence anteceded the distribution agreement dated September 2, 1993 and the introduction of Murad's Spa Line. However, there is no evidence in the record establishing the specific percentage of the net income derived from Murad products and/or services subsequent to the distribution agreement. The only information in the record is that the Spa Line was introduced "[i]n early 1994" without regard to a particular sales volume and the testimony of Catherine Irvine Sarnataro acknowledging that non-Murad products had been sold by IRG during fiscal year 1993–94.

According to Mr. Alvarez–Menéndez, IRG's expert witness, "[i]f they [IRG] sold other products besides the Murad product, definitely the calculations will have to change." Thus, his conclusion regarding IRG's net income for the year preceding the infomercial was contingent on Murad products representing 100% of IRG's business.

Based on the information in the record it is impossible to determine what percentage of the IRG income was attributed to Murad products for this period much less

conclude that it represented 100% as claimed by IRG. Therefore, the basic premise of the expert's opinion to justify damages under Law 75 is flawed. Absent adequate factual data to support the expert's conclusions his testimony was unreliable. Further, it appearing that in awarding damages to IRG the jury accepted the expert's unreliable computations, a new trial regarding IRG damages under Law 75 is warranted.

### INDIVIDUAL CLAIM

The jury awarded Ileana Irvine $100,000 as damages for her pain and suffering and loss of reputation due to Murad's negligent actions regarding the infomercial.

Murad contends that Irvine has no personal cause of action and that there was no evidence of a causal relationship between its "purchase of air time for the infomercial at a New York television station" and Irvine's purported damages (Appellants' Brief at 28).

In this jurisdiction [7] tort liability is governed by art. 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141 (1990) which imposes responsibility for damages caused by negligence or fault. The necessary elements to prevail in a tort action are: (1) a negligent act or omission, (2) damages and (3) a causal relationship between them. *De–Jesus–Adorno v. Browning Ferris Indus. of P.R., Inc.*, 160 F.3d 839, 842 (1st Cir.1998); *Marshall v. Perez Arzuaga*, 828 F.2d 845, 847 (1st Cir.1987); *Montalvo–Feliciano v. Cruz–Concepcion*, 144 D.P.R. ——, 98 JTS 6 at 495, 499 (1998); *Toro–Aponte v. E.L.A.*, 142 D.P.R. ——, 97 JTS 18 at 627 (1997).

Not all actions or omissions which result in injuries/damages will give rise to liability under art. 1802. "Negligence has been defined by the Commonwealth courts as the failure to exercise due diligence to avoid foreseeable risks." *Malave–Felix*, 946 F.2d at 971. Therefore,

---

7. This action is grounded on diversity jurisdiction and hence, we apply local substantive

law. *Marshall v. Perez Arzuaga*, 828 F.2d 845, 847 (1st Cir.1987).

liability will only arise if the damages complained of were reasonably foreseeable to the defendant. *De–Jesus–Adorno*, 160 F.3d at 842; *Montalvo–Feliciano*, 144 D.P.R. ——, 98 JTS at 499; *Toro–Aponte*, 142 D.P.R. ——, 97 JTS at 627; *Ocasio Juarbe v. Eastern Air Lines, Inc.*, 125 D.P.R. 410, 418, 1990 WL 657498 (1990), *official translation reproduced in full in* 902 F.2d 117 (1st Cir.1990); *Rivera Perez v. Cruz Corchado*, 119 D.P.R. 8, 18, 1987 WL 448313 (1987). The duty of care imposed upon a tortfeasor is anticipating reasonably probable injuries to probable victims. *Marshall v. Perez Arzuaga*, 828 F.2d at 847. *See* Herminio M. Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico* § 7.02[2] at 184–5 (2d ed.1986). The foreseeability contemplated by the statute does not include every conceivable consequence of an act or omission since to do so would make the defendant an absolute insurer. *See Montalvo–Feliciano*, 144 D.P.R. ——, 98 JTS at 499; *Pacheco v. A.F.F.*, 112 D.P.R. 296, 300 (1982); *Jimenez v. Pelegrina Espinet*, 112 D.P.R. 700, 704, 1982 WL 210615 (1982).

For purposes of our analysis we will assume that the conduct complained of by Irvine in support of her negligence claim is the same utilized by IRG for its Law 75 action, i.e., allowing the Murad products to be sold directly in Puerto Rico.[8]

■ Inasmuch as our review of the claim is limited by the constraints of a Rule 50 motion, the issue then becomes whether there is sufficiently reliable evidence in the record for a jury to conclude that the mental anguish and loss of reputation averred by Irvine were reasonably to be foreseen to Murad as a probable consequence of the infomercial. In other words whether, based on the facts presented at

trial as well as the permissible inferences derived therefrom, it was reasonable for the trier of fact to find that Murad should have anticipated the resulting damages to Irvine individually. As previously mentioned, there is no actionable claim under art. 1802 if the particular injury/damage complained of by Irvine could not have been reasonably foreseen by Murad.

■ Even though Irvine described in detail the alleged injuries to her reputation, humiliation and pain and suffering caused by Murad's airing of the infomercial in Puerto Rico, liability based on art. 1802 cannot rest on the existence of an injury alone.[9] Irvine did not introduce any evidence to explain why it should have been reasonably foreseeable to Murad that making its products available in Puerto Rico at lower prices would somehow affect her personally. At trial when asked by her counsel to describe her relationship with Murad, separate from that of IRG, Irvine merely responded that it was "cordial" and that she found Dr. Murad "very pleasant." Her testimony in this regard was circumscribed by the tenor of her and her daughter's contacts with the Murad representatives. No mention was made of any particular circumstances in her dealings with Murad which would support her individual claim.

Additionally, the documentary evidence submitted at trial further supports Murad's theory. The distribution agreement was made with the corporation, not Irvine. All the correspondence available in the record which was exchanged between Murad and plaintiffs/appellants was conducted through the corporation.

Accordingly, Irvine did not produce any evidence at trial from which the jury could reasonably conclude that her personal

---

8. The underlying facts in support of Irvine's individual claim were not developed independent of IRG's cause of action.

9. Irvine argued that the withdrawal of her own line of products provided added support to her personal cause of action (Appellee's Brief at 18). However, this particular aspect

of her claim is not properly before us. It was dismissed by the trial court in response to Murad's Rule 50 request due to Irvine's failure to introduce evidence of economic injury and its dismissal was not contested by Irvine on appeal.

damages were a probable and foreseeable consequence of Murad's infomercial. Irvine's individual claim must be DISMISSED for having failed to meet her burden of proof.

## CONCLUSION

Accordingly, the judgment in IRG's favor is **vacated** and Law 75 claim is **remanded** for a new trial. Further, we direct the district court to set aside the judgment regarding Irvine's individual claim and enter judgment as a matter of law in the appellant's favor on this claim. All parties shall bear their own costs.