Laura RIVERA, Plaintiff,

v.

**DHL GLOBAL FORWARDING,**
Defendant.

Civil No. 06–1990(GAG).

United States District Court,
D. Puerto Rico.

Feb. 25, 2008.

Juan M. Frontera–Suau, Esq., San Juan, PR, for Plaintiff.

Lourdes C. Hernandez Venegas, Esq., Carl E. Schuster, Elizabeth Perez Lleras, San Juan, PR, for Defendant.

## OPINION AND ORDER

GUSTAVO A. GELPÍ, District Judge.

Plaintiff Laura Rivera ("Rivera") filed this suit under the court's diversity jurisdiction alleging sexual harassment in violation of Act No. 17 of April 22, 1988, P.R. Laws Ann., tit. 29 § 155 et seq. ("Law 17"), as a result of sexual favoritism by her supervisor during her employment with Defendant DHL Global Forwarding ("DHL"). Rivera also alleges negligence and defamation in violation of Articles 1802 and 1803 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, §§ 5141–5142 ("Article 1802"), as well as constructive discharge under Act No. 80 of May 30, 1976, P.R. Laws Ann., tit. 29 § 185a et seq ("Law 80"). Defendant timely moved for summary judgment (Docket No. 33) averring that plaintiff did not establish: (1) DHL's liability under Law 17; (2) a *prima facie* defamation claim; and (3) a constructive discharge claim. After a thorough review of all pleadings and pertinent law, the court **GRANTS IN PART** and **DENIES IN PART** defendant's motion for summary judgment (Docket No. 33).

### I. Standard of Review

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When deciding a motion for summary judgment, the court must view the record in the light most favorable to the party opposing summary judgment, including all reasonable inferences in the nonmoving party's favor. *See id.* "If, after canvassing the material presented, the district court finds *some* genuine factual issue remains in the case, whose resolution one way or the other *could* affect its outcome, the court must deny the motion." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added). "The movant's burden is particularly rigorous when the disputed issue involves questions of motive or intent, since in these cases jury judgments about credibility are typically thought to be of special importance." *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 895 (1st Cir.1988).

### II. Relevant Material Facts and Procedural Background

The court derives the following factual summary primarily from the parties' statements of material facts. *See* Docket Nos. 33 and 41. Consistent with the summary judgment standard, the court states the facts in the light most favorable to the plaintiff. *See Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir.2006).

Rivera began working for DHL as a sales executive in April 2005. DHL is in the business of freight forwarding, warehousing and distribution. DHL's Puerto Rico office is part of DHL's Eastern Region and does not have a Human Resources Department ("HR Department"). Billie Raisides ("Raisides") was the Director of HR Department and liaison between the HR Department and the Puerto Rico office at the time. DHL's sexual harassment policy was in the employee's manual and posted online in DHL's website. In order to file a sexual harassment claim, the DHL employee could do so directly with her supervisor or by contacting the HR Department via phone or in writing. Rivera received an employee's manual and password to access the DHL's

website when she began working for the company. Rivera was aware of DHL's sexual harassment policy and the procedure for making complaints regarding the same. Rivera took a sexual harassment training via the internet during the first few months of work.

Arquimides Torrado ("Torrado") is the District Manager of DHL's Puerto Rico office, and as such was Rivera's direct supervisor. Torrado hired Rivera after interviewing a few candidates, including Nancy Ocasio ("Ocasio"), because she had prior experience in the ocean transportation industry. The sales executives would normally only spend Mondays at the office arranging the client visits for the rest of the week. Rivera was not initially assigned a specific territory and was allowed to visit her past clients, which were mostly in the hotel industry, as well as any new client without territorial limitations. On September or October 2005, however, Torrado temporarily assigned Rivera to the south territory. The assignment was temporary because DHL was in the process of acquiring another company, and the territories would likely change at that time. Carlos Pina ("Pina"), another sales executive for DHL, resigned on or about September of 2005. Matt Macary ("Macary"), DHL's Regional Vice President of the East Coast interviewed Ocasio again, and Torrado hired her effective November of 2005.

Torrado assigned Ocasio to the metropolitan territory. The parties dispute the reasons for such assignment. Rivera alleges Torrado and Ocasio were having an affair; hence, Torrado assigned Ocasio the most profitable territory. Torrado alleges that, at the time of hiring, the open territory was the metropolitan area, and since Ocasio had less experience in the industry he needed more experienced sales executives in the other territories. Also in dispute is the frequency that Torrado would accompany Ocasio to sales calls compared to the other sales executives. Torrado alleges he accompanied Ocasio once or twice a month, and Rivera alleges it was twice a week. Rumors, jokes and innuendos began to spread around the office that Torrado and Ocasio were having an affair. There were specific references to pictures of Torrado and Ocasio at parties together. Co-workers referred to Ocasio as "the First Lady," and reminded Rivera that Torrado was not bringing her breakfast as he did for Ocasio.

Rivera alleges Torrado only praised Ocasio at meetings and via interoffice emails, which caused mockery throughout the office. Rivera also asserts that Ocasio would receive separate meals from the other personnel during the meetings. Rivera alleges Torrado would call Ocasio frequently into his office and close the door. Rivera asserts that Ocasio would have information about events prior to the other sales executives. On several occasions, Rivera saw Torrado and Ocasio's vehicles parked outside various restaurants. During a group dinner, Rivera saw Ocasio eat from Torrado's plate. Ocasio told Rivera of a weekend outing she had with Torrado at Old San Juan. Ocasio never expressly told Rivera she was having an affair with Torrado. Rivera suspected they were, but never saw any overt romantic gestures between the two. Rivera suspected the relationship was consensual.

On March 21, 2006 Rivera and Torrado went to visit a potential client, which was unable to meet with them. On the walk to their respective cars, Torrado asked to speak to Rivera inside her vehicle. Rivera alleges Torrado berated her, called her names such as conceited, arrogant and know-it-all, and told her Ocasio was a better sales executive than her and would soon surpass her. Rivera asserts Torrado

told her the union personnel hated her. Rivera alleges Torrado told her to apologize to Ocasio for not helping her at work and having a defensive attitude toward her. Torrado then allegedly got out of Rivera's car and slammed the door. Rivera alleges she was shocked, crying and unable to respond to Torrado because of his palpable anger. Later that day, Torrado called Leila Silva ("Silva"), the most senior sales executive, and instructed her not to assist Rivera anymore. That same day, Rivera hired a private investigator to determine whether Ocasio and Torrado were indeed involved romantically. On April 28, 2006, the private investigator followed Ocasio and Torrado to dinner and filmed them. The private investigator ended his investigation that same night, informed Rivera, and later gave her his report and a video of the encounter.

On June 5, 2006, Rivera sent a complaint via regular mail to Raisides at the Human Resources Department. On July 26, 2006, Raisides contacted Rivera to inform her she would be handling the investigation and contacting her co-workers. Raisides explained to Rivera that she had been out of the office for several weeks. Raisides called Rivera later in the week to discuss the allegations and get more details. Raisides then called Paul Osburn ("Osburn"), who has been in charge of the Eastern Region since 1991, to discuss Rivera's complaint. Osburn directed Raisides to investigate the claim, and advised her he would accompany her to Puerto Rico unannounced.

During Raisides visit to Puerto Rico in August of 2006, she met individually with Rivera, Silva, and Catherine Moreno ("Moreno"), Torrado's assistant. Raisides did not meet with Ocasio. Raisides concluded at the end of her investigation that there was no definitive evidence that Torrado created a hostile work environment for Rivera. Raisides based her conclusion in Rivera's denial that Torrado physically abused her or subjected her to unwelcome sexual advances. Raisides did not find it unreasonable for Ocasio to be paid more than Rivera despite Ocasio having less experience in the industry because DHL hired employees at different rates. Raisides concluded that the March 21, 2006 episode alone did not constitute sexual harassment under DHL's Human Resources policy.

Osburn accompanied Raisides to Puerto Rico and met alone with Torrado. Osburn asked Torrado if he was having an affair with Ocasio. Torrado denied the affair. Torrado met with Osburn and Raisides a few more times to discuss other allegations of the investigation. At the end of the investigation Osburn and Raisides agreed that there was no concrete information to substantiate any hostile work environment. Rivera did not disclose to Raisides or Osburn the existence of the private investigator's report or video.

On August 31, 2006, Rivera called Raisides to inquire about the investigation. Raisides returned Rivera's call and informed her that the investigation had ended and Torrado and Ocasio would remain in the office. Then, a meeting was held at 11:00 a.m. where Osburn spoke about DHL's values and that from that point forward there would be a fresh start. Osburn also expressed his support for Torrado. Osburn did not discuss Rivera's complaint and the resulting investigation at the meeting. Torrado addressed the employees at the end of the meeting and told them to focus on their work and not his personal life. After the meeting Rivera left the office to visit clients. Rivera then went on sick leave and did not return to work. Rivera resigned from DHL effective September 25, 2006. Later that day Torrado held an employee meeting and

told them he did not believe they were focused on their work. Torrado also informed them Rivera had resigned and the status of her outstanding accounts.

## III. Legal Analysis

### A. Law 17

██ Plaintiff brings this sexual harassment action pursuant to Act No. 17 of April 22, 1988, P.R. Laws Ann., tit. 29 § 155 et seq, which states in pertinent part:

Sexual harassment in employment consists of any type of undesired sexual approach, demand for sexual favors and any other verbal or physical behavior of a sexual nature when one or more of the following circumstances occur:

(a) When submission to said conduct becomes, implicitly or explicitly, a term or condition of the person's employment.

(b) When submission to or rejection of such conduct by the person becomes the grounds for decisions on the job, or regarding the job, that affect that person.

(c) When that conduct has the effect or purpose of interfering unreasonably with the performance of such person's work or when it creates an intimidating, hostile or offensive working environment. In order to determine whether the alleged conduct constitutes sexual harassment in employment, all of the circumstances surrounding the facts that occurred shall be taken into consideration. The determination of the legality of an action shall be based on the findings of each particular case.

The Puerto Rico Supreme Court has defined hostile work environment as occurring when the sexual conduct toward one person has the effect of unreasonably interfering with that person's work performance or when it creates an intimidating, hostile or offensive work environment. *Af-anador Irizarry v. Roger Elec. Co., Inc.*, 156 D.P.R. 651, 662 (2002). There is no requirement that the conduct produce economic damages or that the nature be sexually explicit. *Id.* at 662–63. The conduct must be sufficiently severe and offensive so as to alter the working conditions and create an abusive work environment. *Albino Agosto v. Angel Martinez, Inc.*, —— D.P.R. ——, 2007 TSPR 111, 2007 WL 1828398 *7 (2007). In order to establish a hostile work environment claim, the plaintiff must allege more than a mere isolated incident of sexual harassment. *In re Hon. Melvin Robles Sanabria*, 151 D.P.R. 483, 500 (2000). The court's analysis should take into consideration various factors such as: (1) the nature of the alleged conduct; (2) the frequency and intensity of the alleged conduct; (3) the context in which the alleged conduct occurs; (4) the duration of the alleged conduct; and (5) the victim's actions and her personal circumstances. *Id.* at 501; *Albino Agosto*, 2007 TSPR 111, 2007 WL 1828398 at *7.

██ Employers are liable because of their own acts or those of their agents and supervisors, regardless of whether those acts were authorized or prohibited by the employer or if the employer knew or should have known of such conduct. *Albino Agosto*, 2007 TSPR 111, 2007 WL 1828398 at *8. The employer is responsible if he knew or should have known of such conduct, whether directly or through constructive knowledge from his agents and supervisors, and did not take immediate and appropriate action to correct the situation. *Id.* The plaintiff can prove the employer knew of the alleged conduct by showing that she directly notified the employer or the employer's agent or supervisor, or by showing that the situation was so evident that they should have recognized it. *Id.* Once the plaintiff establishes the employer's knowledge of the alleged

conduct, then the employer must prove it took immediate and appropriate action to correct the situation. *Id.* An immediate and appropriate action is one that reasonably ends the sexual harassment and effectively prevents its reoccurrence. *Id.* at *9. In order to determine whether the employer took the immediate and appropriate action, the court must examine the circumstances of the case, the existence of an applicable policy to prevent sexual harassment, and the employer's compliance with such policy. *Id.*

■ The employer has an affirmative duty to prevent sexual harassment. *Id.* Law 17 provides some of the requirements for the employer to comply with its duty, which include: (1) to clearly express to the employees and supervisors that the employer has a strict policy against sexual harassment in the workplace; (2) to exercise the necessary means to create awareness that sexual harassment is prohibited in the workplace; (3) to display in the workplace the rights and protection conferred upon the employees by this statute and the Puerto Rico Constitution; and (4) to establish an adequate and effective internal procedure to investigate sexual harassment claims. *Id.*; P.R. Laws Ann. tit. 29 § 155i.

■ In this case, Rivera avers that Torrado created a hostile work environment because of his ongoing affair with Ocasio. Rivera further alleges that Torrado favored Ocasio over the rest of the employees because of their romantic involvement. However, Rivera only had to be in the office on Mondays and for scheduled meetings. Even if Torrado's affair with Ocasio had been overt, which the facts do not indicate, Rivera has not established how Torrado and Ocasio's behavior altered her work conditions and created an abusive environment. Rivera was still able to contact her clients and visit them without any interference by Torrado or Ocasio. Rivera spent minimal time in the office where Torrado worked at. The facts as alleged by Rivera do not rise to the level of an actionable Law 17 claim. The work environment at DHL's Puerto Rico office as described by Rivera was not sufficiently severe and offensive to support a claim for hostile work environment under Law 17. Even taking Rivera's allegations as true, the only incident that is severe enough to warrant mentioning is the March 21, 2006 confrontation inside Rivera's car. Rivera herself admitted that Torrado did not engage in such offensive behavior again. Therefore, it alone is not enough to support Rivera's argument that it materially altered her working conditions at DHL. Wherefore, the court grants DHL's motion for summary judgment on the Law 17 claim because Rivera did not provide sufficient facts to make out a *prima facie* case of hostile work environment.

### B. Law 80

Plaintiff avers she was constructively discharged as defined in Act No. 80 of May 30, 1976, P.R. Laws Ann., tit. 29 § 185a et seq, which states in pertinent part:

> For the purposes of §§ 185a–185l of this title, discharge shall be understood to be, besides the employee's layoff, his suspension indefinitely or for a term over three (3) months, except in the case of employees of seasonal industries or businesses **or the resignation of the employee caused by the actions of the employer directed to induce or compel him to resign, such as imposing or trying to impose on him more onerous working conditions, reducing his salary, lowering his category or submitting him to derogatory criticisms or humiliations by deed or word.** (emphasis added)

■■■■ The basic elements for a constructive discharge claim are: (1) considerably serious actions by the employer that create an intimidating, hostile and offensive work environment; and (2) for the employee to have no other available alternative but to resign. *Sanchez Quiñonez v. Walgreens of P.R.*, 2005 WL 2516268 *10 (TCA); *Del Rosario v. Horwath, Velez, Semprit & Co.*, 2003 WL 23314695 *6 (TCA). The Puerto Rico Supreme Court has established that in order for the voluntary and unjustified acts by the employer to constitute an implicit or constructive discharge, the plaintiff must prove that the only reasonable alternative that she had was to resign. *Nazario Acosta v. Estado Libre Asociado de P.R.*, 159 D.P.R. 799, 810 (2003); *Arthur Young & Co. v. Vega*, 136 D.P.R. 157, 183 (1994); *Velez de Reilova v. Ramirez Palmer Bros., Inc.*, 94 D.P.R. 175, 178 (1967). The plaintiff must also clearly detail the acts that allegedly motivated her resignation and demonstrate the magnitude of the onerous working conditions. *Rivera Figueroa v. The Fuller Brush Co. of P.R., Inc.*, 2006 WL 3469301 *3 (TCA). A mere annoyance or disagreement with the employer's measures is insufficient to sustain a constructive discharge claim. *Id.* at *5; *see also Sociedad Legal de Gananciales v. Royal Bank de P.R.*, 145 D.P.R. 178, 207 (1998). If the employer had a legitimate business reason for its actions, without the intention to harm the employee's working conditions, then constructive discharge would not apply. *Sanchez Quiñonez v. Walgreens of P.R.*, 2005 WL 2516268 at *10.

■■■■ Due to the aforementioned reasons, Rivera did not establish she was subjected to a hostile work environment at DHL. Rivera had disagreements with management due to the territory assignments, and frequency of assistance from Torrado in accompanying her to visit clients. Rivera did not like Torrado's alleged affair with Ocasio, and the jokes her co-workers made about it. However, these mere annoyances in the workplace are not sufficient to prove that Rivera's only reasonable alternative was to resign. Therefore, the court finds that there was no constructive discharge, and grants DHL's motion for summary judgment on the Law 80 claim as well.

### C. Article 1802 [1]

#### 1. Negligence

■■■■ Plaintiff asserts a claim of negligence under Articles 1802 and 1803 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, §§ 5141 and 5142, which state in pertinent part:

> A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity.

"Article 1802 is Puerto Rico's basic tort statute." *Matos Ortiz v. Commonwealth of P.R.*, 103 F.Supp.2d 59, 63 (D.P.R.2000). In order to prevail in a tort action, the plaintiff must prove: (1) the damage suffered, (2) a causal relationship between the damage and the action or omission of another person; and (3) that said act or omission is negligent or wrongful. *Santini Rivera v. Serv Air, Inc.*, 137 D.P.R. 1, 6 (1994); *see also Irvine v. Murad Skin Research Lab.*, 194 F.3d 313, 321 (1st Cir. 1999). Damage is any material or moral loss suffered by a person, either in their

---

1. The court notes that Rivera did not address this cause of action in her opposition to summary judgment (Docket No. 40). However, there are sufficient facts alleged in the pleadings for the court to conduct its analysis.

rights or property, brought about by a violation of a legal provision chargeable to another party. *Santini Rivera*, 137 D.P.R. at 7. The Puerto Rico Supreme Court has held that a tortious act is all-embracing, and Article 1802's concept of fault is as ample as human conduct. *Id.* at 8. "In most cases, the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." *Vazquez–Filip-petti v. Banco Popular de P.R.*, 504 F.3d 43, 49 (1st Cir.2007). "[A] defendant only breaches this duty if he acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." *Id.* Furthermore, the Puerto Rico Supreme Court has recognized that if oth-er independent tortious actions concur with a discharge, the employer may be held liable for such conduct under a negli-gence cause of action. *Acevedo Santiago v. W. Digital Caribe, Inc.*, 140 D.P.R. 452, 459 (1996); *see also Porto v. Bentley P.R., Inc.*, 132 D.P.R. 331, 342 (1992); *Rivera v. Sec. Nat'l Life Ins. Co.*, 106 D.P.R. 517, 527 (1977); *Pagan–Alejandro v. PR AC-Delco Serv. Ctr., Inc.*, 468 F.Supp.2d 316, 330 (D.P.R.2006) (holding Law 80 discrimi-nation claims can give rise to a cause of action under Article 1802).

 Rivera asserts that DHL was neg-ligent in its investigation of her hostile work environment claim because it took almost two months to respond to her com-plaint. Also, Raisides, who was in charge of the investigation, did not even interview Ocasio. Furthermore, Raisides did not re-port back to Rivera at the conclusion of her investigation to advise her of the re-sults or give her any type of explanation as to her conclusions. Rivera herself had to follow-up with Raisides to inquire about the status of her complaint. In the mean-time Rivera alleges she suffered mental and emotional distress while waiting on the outcome of the investigation.

Pursuant to Law 17 DHL has a duty to its employees to handle complaints in a fast and efficient manner in order to insure that no harm will result to them in the workplace. Whether or not it was deter-mined at the conclusion of the investiga-tion that Rivera brought an actionable claim does not relieve DHL from its duty to properly investigate. There is a materi-al issue of fact as to whether DHL handled the investigation properly, from its incep-tion to its conclusion. Rivera has brought forth sufficient facts to support her negli-gence claim against DHL. Hence, the court denies DHL's motion for summary judgment as to the general negligence claim under Article 1802, but limited as to whether DHL negligently investigated Rivera's complaint.

### 2. Defamation

 Defamation is a generic tort actionable under Article 1802 as long as it does not involve malice. *Ojeda v. El Voce-ro de P.R., Inc.*, 137 D.P.R. 315, 325–26 (1994). Article 1802's defamation cause of action requires: (1) the publication of a defamatory statement, made either by fault or negligence, (2) damages, and (3) a causal relationship between them. *Id.* at 326. The publication element occurs when the defamatory statement is communicated to a third person. *Acevedo Santiago*, 140 D.P.R. at 461. The court while analyzing a defamation claim must not only deter-mine if the plaintiff has proven the three elements, but must also weigh the defen-dant's right to freedom of speech against the plaintiff's right to privacy. *Ojeda*, 137 D.P.R. at 328. In Puerto Rico, defamation is considered an offense against the indi-vidual's honor and damages are viewed in that context. *Id.* at 329.

Rivera has not proffered any evidence that Torrado or anyone else at DHL made defamatory statements against her charac-

ter. Therefore, since Rivera has not established a *prima facie* defamation claim, the court grants DHL's motion for summary judgment on the defamation claim.

## IV. Conclusion

At this stage of the proceedings, mindful of the duty to make all reasonable inferences in the plaintiffs' favor, the court finds that triable issues remain as to DHL' alleged liability under a negligence theory. Accordingly, the court **GRANTS IN PART** and **DENIES IN PART** DHL's motion for summary judgment (Docket No. 33). Rivera's Law 17, Law 80 and Article 1802's defamation claims are hereby dismissed with prejudice.

**SO ORDERED.**