# United States Court of Appeals
## For the First Circuit

Nos. 14-2055, 14-2066

MEDINA & MEDINA INC.,

Plaintiff, Appellant; Cross-Appellee,

v.

HORMEL FOODS CORPORATION,

Defendant, Appellee; Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Lipez, Circuit Judges.

Jaime Sifre Rodríguez, with whom Marta E. Vilá Báez, Amanda Collazo Maguire, and Sánchez-Betances, Sifre & Muñoz-Noya were on brief, for appellant/cross-appellee.
Luis A. Oliver, with whom Salvador Antonetti-Zequeira and Fiddler González & Rodríguez, P.S.C. were on brief, for appellee/cross-appellant.

October 21, 2016

**LIPEZ**, **Circuit Judge**.  This case involves a dispute over an unwritten and allegedly exclusive distributorship agreement between Medina & Medina, Inc. ("Medina") and Hormel Foods Corp. ("Hormel") under Puerto Rico's Dealer's Contracts Act ("Law 75"), see P.R. Laws Ann. tit. 10, §§ 278-278e.  Medina, a Puerto Rico-based distributor of refrigerated food products, brought a lawsuit against its principal, Hormel, seeking a declaration that Medina is the exclusive distributor of Hormel's retail refrigerated products in Puerto Rico.  Medina also claimed that Hormel violated the exclusive distribution agreement and hence Law 75 by selling Supreme Party Platters directly to Costco while bypassing Medina, and subsequently refusing to sell its new retail refrigerated products to Medina on account of this lawsuit.  Medina sought damages for those violations.  Hormel filed counterclaims, asserting, inter alia, that Medina is not an exclusive distributor.

The parties' claims were evaluated by the court through multiple proceedings, including, ultimately, a bench trial.  After the trial, the district court reached the following conclusions: (1) Medina's exclusivity claim was time-barred by the three-year statute of limitations under Law 75; (2) Hormel's counterclaim that Medina was not its exclusive distributor was moot in light of the court's statute of limitations ruling; (3) notwithstanding the time bar for Medina's exclusivity claim, Hormel's sales of Supreme Party Platters to Costco violated Law 75; and (4) Hormel was not

- 2 -

liable for refusing to sell its new retail refrigerated products to Medina.  The parties cross-appealed.

Medina claims that the district court misunderstood its exclusivity claim, construing it as one of "airtight exclusivity," a type of exclusive arrangement that prohibits stateside distributors from reselling products into the Puerto Rico market. Rather, Medina argues that it has only claimed to be the exclusive distributor based in Puerto Rico for Hormel's retail refrigerated products.  In its cross-appeal, Hormel makes the argument, inter alia, that the court's imposition of liability for Hormel's Costco transactions is inconsistent with the court's finding that any exclusivity claim is barred by the statute of limitations.

Having carefully considered these claims, we agree with the district court that Medina's exclusivity claim as presented is time-barred.  However, we conclude that the statute of limitations bar to recovery extends to Medina's Costco-related claim as well. Hence, we affirm the district court's judgment in part and reverse it in part.

**I.**

Medina, a company based in San Juan, purchases and distributes refrigerated products to retailers in Puerto Rico. Hormel is a multinational food corporation with its principal place of business in Minnesota.  Hormel produces, among other products, refrigerated food items that are sold at various retail stores in

the continental United States and Puerto Rico.  The dispute in this case, which arises under Puerto Rico's Law 75, was brought in federal court based on diversity jurisdiction.  See 28 U.S.C. § 1332.

Much of the dispute in this case involves whether Medina argued for airtight exclusivity in its pleadings and in the district court proceedings, and, if so, when the statute of limitations accrued for such an exclusivity claim.  Medina argues that it has never claimed airtight exclusivity; rather, according to Medina, it has alleged throughout the proceedings below only that it is the exclusive distributor based in Puerto Rico for Hormel's retail refrigerated products for the Puerto Rico market. Hormel contends that the exclusivity arrangement alleged by Medina is -- and has always been -- one of airtight exclusivity, and that the district court was correct to construe it as such in finding the claim to be time-barred.  We examine the facts and the procedural background with this disagreement in mind.  It is critical to an assessment of the statute of limitations ruling.

A.  Distribution Arrangement

The facts underlying the origin of the parties' relationship are undisputed.  In May 1987, Pepin Medina ("Pepin"), Executive Vice President of Medina,[1] met Jim Dinicola and Tony

_____

[1] The titles of individuals are their titles at the time that the relevant events took place.

- 4 -

Alonso,[2] Vice President of Sales and National Accounts Sales Manager for Food Service at Hormel, respectively, at a food show in Chicago. Pepin and Dinicola discussed Law 75 and Hormel's experience with a prior exclusive distribution arrangement in Puerto Rico. Dinicola remarked that Law 75 is "a cut-throat law," and that it is "one of the things stopping [Hormel] from going into the Puerto Rican market."

Several months later, Pepin, Dinicola, and Alonso met again in Austin, Minnesota, to further discuss the prospect of Hormel entering the Puerto Rico market. Dinicola indicated that Hormel was considering appointing Medina as its distributor in Puerto Rico. Dinicola reiterated, however, the concern regarding exclusivity under Law 75. Pepin responded that because Puerto Rico is a small market, non-exclusivity would mean "bumping heads every day . . . with competition," including competition from mainland distributors. Pepin told Dinicola, "[i]f we are not exclusive, we are not interested [in distributing Hormel's products]."

Then, in April 1988, several Hormel executives, including Dinicola and Alonso, traveled to Puerto Rico and attended a food show at which Medina had a booth displaying Hormel's products and logo. During the same trip, the Hormel executives

---

[2] To avoid confusion with the name of the company, we refer to Pepin Medina and Eduardo Medina by their first names.

- 5 -

also attended a dinner party held by Pepin at La Casona.  At this party, Dinicola told Pepin, "Pepin, let's go ahead, you go ahead and distribute the Hormel product."  That remark formed a verbal agreement between the parties, and Medina has since distributed Hormel's products in Puerto Rico.  No written distribution agreement was signed by the parties.

## B.  Retail Refrigerated Products

Medina has distributed two types of Hormel products since 1988:  retail refrigerated products and food service products.  Retail refrigerated products are branded products or commodity-based products that can be marketed under a brand at retail stores.[3]  Food service products are items sold to institutions such as hotels, restaurants, and cafeterias, which then prepare and sell the products to an end user, who is often an individual customer.  Since the beginning of the distributorship arrangement with Medina in 1988, Hormel has not sold retail refrigerated products to any other distributors based in Puerto Rico besides Medina.  Hormel's food service products, by contrast (which we will address under a separate subheading below), have been marketed in Puerto Rico through multiple Puerto Rico-based

---

[3] While Medina describes itself as the exclusive distributor of Hormel's "retail refrigerated products and fresh pork," Medina suggests in its briefs that fresh pork is among the retail refrigerated items.  We rely on this understanding and use "retail refrigerated products" as a term that is inclusive of fresh pork products.

distributors at different times. Medina claims to be the exclusive distributor only of Hormel's retail refrigerated products, not of its food service products, for the Puerto Rico market.

With respect to Hormel's retail refrigerated products, the communications between Medina and Hormel over the years consisted largely of Medina's complaints (and Hormel's responses) concerning Hormel's supply of retail refrigerated products to stateside distributors, which then resold those products to Puerto Rico retailers. In January 1990, Medina complained to Hormel that Pueblo Supermarkets ("Pueblo"), a grocery chain based in Puerto Rico, had ceased purchasing Hormel products from Medina because it was buying them at a lower price from Malone & Hyde, a Florida-based distributor. In the following years, Medina made similar complaints about stateside distributors interfering with its business in Puerto Rico. In April 2001, Ron Fielding, Group Vice President of the Meat Products Division at Hormel, tried to assuage Medina's concerns in this regard, stating:

> I remain very anxious to remove all doubt that for certain aspects of your business you are our primary, if not exclusive partner. The retail packaged meat category clearly benefits from your expertise and experience in the market. Your capability to service the business at all levels (headquarters/stores) is excellent.

Nevertheless, Hormel continued to sell its refrigerated products to mainland distributors, which then resold those

products in the Puerto Rico market. In September 2001, Pepin complained to Hormel that two local supermarket chains had refused to buy Hormel products from Medina because they were getting better prices from stateside distributors, such as White Rose, a distributor based in New Jersey. Pepin wrote:

> This letter intends to get from you assurance that Hormel will not put us at a disadvantage relative to other distributors selling into our market. Specifically, we want your commitment that Hormel will not give lower prices (directly or by means of promotions, deals, etc.) to any distributor in the mainland than the prices billed to us.

In response, Alonso assured Pepin that Medina would continue to receive "the best price on retail products sold by Hormel Foods directly into the Puerto Rico market." Focusing on the word "directly," Pepin wrote in reply: "[A]s you know, some of your mainland distributors sell [Hormel refrigerated products] directly into our customers in [Puerto Rico]. To the extent that they get better pricing, deals, or terms than we do, we will be handicapped to grow the business here." He then added, "[y]ou say that you are not giving lower prices to your mainland distributors selling to our market, but you are not willing to commit to the principle that this will not happen."

In August 2002, Medina raised a concern of a different nature with Hormel. Pepin complained to Fielding that one of Hormel's meat group sales representatives was planning to make a

presentation to the head merchandiser at Pueblo regarding Hormel's Always Tender fresh pork products without Medina's presence. Fielding explained in response that Hormel was simply reacting to Pueblo's interest in the product, and that it was not trying to "sell around" Medina. Fielding also indicated, however, that it was the customer's decision as to what kind of local support it would require and Hormel cannot force Pueblo to purchase the product through Medina. Despite these exchanges, the Always Tender fresh pork products were ultimately distributed through Medina.

Medina's complaints about stateside distributors continued into the early 2000s. In June 2003, Pepin complained about White Rose, which had opened up a distribution center in Puerto Rico to cater to local wholesalers and retailers. Pepin stated in a letter that this move by White Rose would "present serious problems," and that "[Hormel] should be aware of them and do the necessary to protect [Medina's] efforts in [Hormel's] behalf and mitigate problems."

Then, in 2005, Medina began characterizing its complaints regarding stateside distributors reselling into the Puerto Rico market explicitly in terms of exclusivity. In June 2005, Pepin wrote to Fielding to complain about stateside wholesalers, including White Rose and A.J.C. International, buying Hormel refrigerated products and selling them to retailers in Puerto Rico. Pepin stated in the letter:

- 9 -

After a careful review and analysis of this situation, we understand that said actions, if [not] stop[ped] immediately, constitutes an impairment of our relationship with Hormel as principal, and [us] as the distributor[] of your products in Puerto Rico . . . . It is important for us to place this situation in proper perspective because these wholesalers with operations in Puerto Rico are infringing in our relationship with you, our principal; undermining our relationship with our customers; and devaluating our company. In fact, allowing these wholesalers to sell your products within our territory results in allowing a second or parallel distribution in the region.

Pepin requested in the letter that Hormel "compel these wholesalers and/or retailers to cease and desist from interfering with our distribution of Hormel products in Puerto Rico by not selling your products in Puerto Rico."

Hormel rejected this request. Fielding clarified in response that Hormel views Medina "as [its] retail distributor on the island of Puerto Rico," and hence Hormel "cannot interfere with the legitimate purchase of [its] products in the United States." He then noted, "[w]hile you doubtless feel that Law 75 somehow protects you from this competition, we do not agree."

Another dispute arose in January 2006 when Pueblo decided to purchase certain Hormel products from Topco, a stateside distributor. Pepin wrote to Gary Ray, then Hormel's Executive Vice President of Refrigerated Foods, that he was "upset" with "Hormel's disregard [for] our exclusive distribution contract and

the legal obligation to act in good faith to protect the exclusivity granted for our territory." He continued, "[t]here is no question that [Medina] is Hormel's exclusive distributor for the Commonwealth of Puerto Rico," and asked that Hormel advise Topco and Pueblo that it will no longer supply fresh pork to Topco in order for Topco to resell to Pueblo. Pepin also wrote that Medina will "do everything [it] must do to protect [its] exclusive distribution contract," and that he wanted to "create a historical memory for this event and the future."

Ray stated the following in his reply:

> Contrary to the assertions in your letter, we do not have any written contract with [you], or any exclusive distribution agreement. For many years, [Hormel] has sold products through other brokers and distributors in Puerto Rico. Moreover, while we recognize that [Medina] has worked with Pueblo on the Fresh Pork Program, we cannot dictate Pueblo's method of acquiring fresh pork products. Pueblo has made a decision, without regard to [Hormel] or [Medina].

Ray then observed that Hormel's relationship with Medina has "always been based on the premise that [Medina] get[s] paid to interact with the customer," and suggested that Medina negotiate with Pueblo directly to continue their transactions concerning Hormel's fresh pork products. The letter concluded, however, that, "[i]f . . . Pueblo's decision to purchase exclusively from Topco is final," Hormel "has no choice but to sell fresh pork products to Topco."

- 11 -

## C.  Food Service Products

While Medina claims exclusivity only as to Hormel's retail refrigerated products, we agree with the district court that the entire course of dealing between Medina and Hormel during the relevant time period is helpful in understanding the business relationship between the two parties, especially given the lack of a written contract.  Accordingly, we examine the parties' communications regarding Hormel's food service products.

Starting in 1999, Medina wrote a series of letters complaining to Hormel about other distributors, local and stateside, selling Hormel food service products in Puerto Rico. In July 1999, Pepin complained to Hormel that Sysco, a mainland distributor, was selling Hormel's food service products to the Wyndham hotel chain in Puerto Rico through Plaza Provision Company, a Puerto Rico-based distributor.  In September 2001, Pepin made a similar complaint regarding market competition when Hormel appointed José Santiago, Inc., a Puerto Rico-based company, as its food service distributor for the Puerto Rico market.

Then, in November 2001, Hormel appointed an in-house broker for Ballester Hermanos, a Puerto Rico-based distributor and a competitor to Medina, as its representative in the Puerto Rico food service business and asked Medina to focus on the retail distribution instead.  Medina objected to Hormel's decision to

"take away" its food service business, which accounted for half of Medina's total Hormel volume.[4]

Following this exchange, Medina began focusing its complaints on Hormel's food service distributors' interference with Medina's retail refrigerated business. In 2003 and 2004, Medina complained to Hormel that its food service distributors, including Ballester Hermanos, were supplying Hormel refrigerated products in the deli departments of several of Medina's customers, which Medina called "a clear and flagrant intrusion into [Medina]'s retail accounts." Similarly, in August 2004, Pepin wrote a letter to Hormel to clarify its market status as a distributor, in light of the alleged interference by the food service distributors. There, he stated that Medina was "the sole Hormel distributor/agent in Puerto Rico authorized to service the Deli Departments of all retail and club accounts in Puerto Rico." In response, Ray agreed with this statement, noting that Medina "is the sole distributor in Puerto Rico authorized to service the 'in the glass' and 'home meal replacement' areas of delis located within retail stores and club accounts who take possession of their products in Puerto Rico."

Despite this clarification, Medina's complaints continued. In June 2005, Ray wrote the following in response to

---

[4] Even after this decision, however, Medina continued to sell Hormel food service products on a non-exclusive basis.

- 13 -

a complaint concerning the food service distributors' alleged interference with Medina's retail business:

> We have made it clear to our distributors . . . and our people that the retail marketplace[] is your venue. If you have specific example of sales people visiting and soliciting business from retailers within your territory, please advise and we will make every effort to see that the practice is stopped.

In July 2005, Medina's counsel wrote to Hormel's counsel to confirm in writing "the essential terms of the distribution by [Medina] of the Hormel Foodservice products in Puerto Rico." The letter also sought confirmation that "[Medina], as Hormel's exclusive retail distributor, is the sole entity authorized to solicit and/or quote and/or sell Hormel products to any and/all retail accounts within Puerto Rico." Hormel's counsel re-phrased this statement and confirmed the following: "Hormel has no other retail distributors on the island of Puerto Rico. As we have stated in the past, Hormel remains committed to its relationship with [Medina] and, of more importance, remains optimistic that [Medina] will continue to grow the business."

**D. Supreme Party Platters**

In 2008 a dispute arose over Hormel's sales of Supreme Party Platters to Costco. This dispute, however, occurred against the backdrop of Medina's business relationship with Costco, which began in 2002.

Eduardo Medina ("Eduardo"), Vice President of Medina, met in 2002 with buyers from Costco to introduce Hormel party platters to the Costco stores in Puerto Rico. The Hormel party platters came in two kinds: the dry party platters contained cured meats, cheese, and crackers, and the wet party platters contained ham, turkey, cheese, and crackers. Later in 2002, Costco opened its first warehouse in Puerto Rico, and Kamran Mossadeghi, Costco's deli buyer, began purchasing Hormel products from Medina, including the party platters. Massadeghi worked in Atlanta, the location of Costco Southeast, which manages the Costco stores in Puerto Rico. This was the first time that the Hormel party platters were sold to Costco.

From 2002 until November 2008, the party platters distributed by Medina sold well at the Costco stores in Puerto Rico, which were the only Costco stores that sold those products. Then, in September 2008, Medina learned from Danny Payne, an assistant buyer at Costco, that Costco would discontinue purchasing Hormel's wet party platters from Medina. That same day, Medina was also notified by Hormel that Hormel would begin selling Supreme Party Platters, which were intended to be an improvement on Hormel's regular party platters, directly to Costco Southeast. Hormel developed the Supreme Party Platters because Lisa Reinert, the new deli buyer for Costco, was looking for a platter that would work across all Costco locations, not just in

- 15 -

Puerto Rico.  Hormel then offered two options to Medina:  Medina could receive a five-cents-per-pound brokerage fee on the Supreme Party Platters, or Hormel could sell the Supreme Party Platters through Medina if Medina lowered its price for the platter so that Costco could sell the product at its target price.  Medina refused both options.  Pepin wrote that "offer[ing] to pay [Medina] a commission to cover the[] direct sales to Costco Southeast" is not acceptable because Medina is Hormel's "exclusive distributor" of Hormel's retail refrigerated products, not a "broker."

From November 2008 to January 2009, the wet party platters were not sold at the Costco stores in Puerto Rico; instead, Hormel sold the Supreme Party Platters directly to Costco Southeast, which then provided those products to the Puerto Rico Costco stores.  Then, in January 2009, Costco ceased the sale of the Supreme Party Platters because the sales were "terrible." Costco thereafter resumed purchasing the wet party platters from Medina.

## E.  New Retail Refrigerated Products

On February 3, 2009, Medina filed this lawsuit, seeking a declaration that Medina is the exclusive distributor of Hormel's retail refrigerated products, and that Hormel violated the exclusive distribution agreement and Law 75 by selling the Supreme Party Platters directly to Costco.  Medina also sought damages. About a month later, in March 2009, Medina and Hormel gave a joint

- 16 -

presentation to Pueblo and Sam's Club concerning Hormel's new products.  Following this presentation, Eduardo wrote to Patrick Schwab, the Director of Meat Sales at Hormel, to request information on the new products, which Pueblo and Sam's Club had asked for from Medina.  Schwab refused, however, stating:

> [We] view[] the lawsuit you filed against us as an insurmountable obstacle which prevents us from making any additional products available to the Puerto Rico retail market. Thus, Hormel will not offer your company any new items . . . that were discussed in our last meeting.  We will, however, continue to offer your company any products that were sold prior to the initiation of the lawsuit, subject to availability.

Schwab also explained to Pueblo that, "[u]ntil we resolve those legal issues with [Medina], we are unable to make additional products available to your Puerto Rico locations."

Medina then amended its complaint to include a claim that Hormel's refusal to sell its new retail refrigerated products to Medina violated the exclusive distribution agreement and Law 75.  This was so, Medina argued, because Hormel had historically sold new retail refrigerated products to Medina for the Puerto Rico market, and the exclusive distribution agreement compels Hormel to continue this practice.

In March 2014, while this lawsuit was pending, Hormel reversed course and began selling new retail refrigerated products to Medina.

**II.**

As previously noted, the procedural history of this case is critical to understanding the parties' arguments on appeal, particularly with respect to the airtight exclusivity issue. Thus, we carefully examine the arguments that the parties made below and the district court's treatment of them.

**A. Pleadings**

In Count I of the amended and operative complaint,[5] Medina sought a declaration, pursuant to Law 75, that Medina was "the exclusive retail distributor of the Hormel refrigerated products in the Commonwealth of Puerto Rico, including, as has been the relationship, the new products developed by Hormel," and that Hormel violated the parties' mutual agreement to that effect and Law 75 by selling the Supreme Party Platters directly to Costco. Am. Compl., Docket No. 3, at ¶ 24.a.[6] Relatedly, Count II

---

[5] There are two causes of action in both the amended complaint filed by Medina and the answer and counterclaim filed by Hormel. To distinguish the parties' claims, the first and second causes of action in the amended complaint are referred to herein as Count I and Count II, respectively, and Hormel's two causes of action are referred to as First Cause of Action and Second Cause of Action.

[6] We use the following format for citations to the record materials from the district court's docket: the name of the document, followed by the docket number and the page and/or paragraph number of the statement the citation supports. The only exception is when we refer to the trial transcript from February 28, 2013, in which instance we use "Trial Tr." for the document name. The case number in the district proceedings was 3:09-cv-01098-JAG.

sought damages based on Hormel's alleged violation of the agreement by refusing to sell the new products to Medina on account of the lawsuit. Id. at ¶¶ 25-28.

In its answer and counterclaim, Hormel introduced the concept of "airtight exclusivity," which it used to describe Medina's exclusivity argument.[7]  Answer to Am. Compl. and Countercl. ("Answer and Countercl."), Docket No. 4, at 4, ¶ 10. Hormel noted, for instance, that, despite Medina's claim of "airtight exclusivity[,] which would preclude even sales to customers outside of Puerto Rico who resell in Puerto Rico," Hormel has "always asserted its right to sell to customers outside of Puerto Rico without requiring that such customers refrain from reselling in Puerto Rico." Id. at ¶ 11.  Hence, to the extent that the parties agreed on any exclusive distribution arrangement, Hormel argued that such exclusivity "would not extend to sales by Hormel to customers outside of Puerto Rico who then decide to sell a portion or all of its purchases in Puerto Rico." Id. at 5, ¶ 12. Additionally, Hormel alleged that Medina threatened to sue Hormel's stateside distributors based on the false premise of airtight exclusivity, and that as a result, certain stateside

---

[7] We note that "airtight exclusivity" is a term introduced by Hormel and is not defined under Law 75.  We adopt the terminology in our analysis, using it in the same way it was used by the parties and the district court in the trial proceedings. See infra Section III.B (defining airtight exclusivity).

distributors had ceased buying Hormel's products, leading to a loss of sales for Hormel.  Id. at 6-7, ¶¶ 6-10.  Based on these allegations, Hormel sought damages (Second Cause of Action), id. at 8, ¶¶ 18-22, and a declaration (First Cause of Action) that Medina "does not have the exclusive right to purchase Hormel products for resale in Puerto Rico," id. at 7, ¶ 14.

In answering Hormel's counterclaims, Medina all but admitted that the exclusivity it was arguing for in the amended complaint was airtight exclusivity.  Medina wrote, for instance, that as the "exclusive distributor of the Hormel refrigerated products for the retail market in [Puerto Rico]," it has "the obligation and right to protect said exclusive distribution agreement against tort[i]ous interference by third parties" -- that is, by informing them of the exclusivity and requesting that they cease and desist reselling Hormel refrigerated products in Puerto Rico.  Answer to Countercl., Docket No. 10, at 3, ¶ 6. Medina also argued that Hormel's insistence that it can "sell to customer[s] outside Puerto Rico even if they resell all or a portion of its purchases in Puerto Rico" violates "the exclusive distribution agreement" and Hormel's "obligation to protect [it]." Id. at 4, ¶ 11; see also id. at 7-8, ¶ 13 ("Hormel's position that Law 75 permits Hormel to allow parallel lines of distribution into Puerto Rico, so long as the transaction is outside Puerto Rico is not supported by Law 75.").

- 20 -

**B. Summary Judgment Motions and the Order for Clarification**

The parties conducted discovery, during which several depositions were taken. Then, both parties moved for partial summary judgment. Hormel argued that Medina's lawsuit should be dismissed to the extent that it relies on airtight exclusivity because the parties never agreed on such an arrangement, and Law 75 enforces only the parties' own agreement. Hormel also raised the timeliness issue, asserting that, "[e]ven if Medina had airtight exclusivity in the sense that it had the right to demand that Hormel take steps to prevent customers based on the US mainland from selling into Puerto Rico," any such claim would be barred under Law 75's three-year statute of limitations. Mot. for Summ. J. and Mem. of Law in Supp., Docket No. 33, at 15. Indeed, Hormel argued that Medina had notice of "detrimental acts" by Hormel -- which triggers the statute of limitations under Law 75 -- as early as 1989, soon after the distribution arrangement began, id. at 16, and at the latest by January 2006, when Ray denied to Pepin that Hormel has "any written contract with [Medina], or any exclusive distribution agreement," Statement of Uncontested Facts, Docket No. 33, at ¶ 43. Medina, for its part, asked for a partial judgment in its favor regarding Hormel's violation of the exclusive distribution agreement, particularly with respect to Hormel's sales of the Supreme Party Platters to Costco. While not addressing the statute of limitations directly, Medina wrote that

- 21 -

it has "put Hormel on notice of the interference of third parties in [Medina's] exclusive territory, the Puerto Rico retail market," and, "once informed of the interference, Hormel failed to comply with its legal duty" to take measures to stop such third party interference. Medina & Medina, Inc.'s Mot. for Partial Summ. J. ("Medina's Summ. J. Mot."), Docket No. 34, at 2, ¶¶ 4-5.

The magistrate judge recommended that the district court grant Hormel's summary judgment motion and deny Medina's. Report and Recommendation, Docket No. 59, at 32. Specifically, the magistrate judge made the following recommendations: (i) to the extent that Medina's exclusivity claim relies on events that occurred before the three years prior to the filing of the lawsuit, such a claim is time-barred, id. at 18-19; (ii) the course of dealing between the parties indicates that their distribution agreement did not cover airtight exclusivity, which would preclude Hormel from selling retail refrigerated products to stateside distributors that resell them in Puerto Rico, id. at 28-29; (iii) there is a genuine issue of material fact as to whether the distribution agreement covered Hormel's direct sales to the Puerto Rico market, such as Hormel's sales of the Supreme Party Platters to Costco, id. at 29-30; and (iv) Hormel's refusal to sell the new refrigerated products to Medina does not violate the distribution agreement, id. at 30-31.

The district court adopted the magistrate judge's recommendations in full, except as to (ii). The court found that a letter from 1996 that Medina had proffered[8] "inject[ed] a genuine issue of material fact" as to whether the distribution agreement between the parties covered airtight exclusivity, i.e., "a prohibition regarding sales to mainland distributors." Op. and Order, Docket No. 74, at 14-15. The court concluded, however, that any such claim of airtight exclusivity is time-barred under the three-year statute of limitations prescribed by Law 75, as Medina was on notice at least by August 2005 when Fielding confirmed that Hormel would continue to sell products to mainland distributors. Id. at 17. Hence, while the district court rejected the magistrate judge's conclusion that there is no genuine issue of material fact as to whether the distribution agreement encompassed airtight exclusivity, the court nonetheless granted Hormel's summary judgment motion regarding airtight exclusivity based on the statute of limitations. Id. at 18. The district court appears not to have addressed the magistrate judge's

_____

[8] This letter from Robert A. Slavik, Vice President of Meat Products for Hormel, stated that Slavik spoke with Hormel's International Division, and that the Division has "stepped out of the communication with any customers who would be involved in product sold domestically that could end up in Puerto Rico and, therefore it is now under our full control." As the district court noted, however, the context of this letter is unclear, and, in any event, it is superseded by subsequent communications between the parties in which Hormel clearly indicated that it does not view the distribution arrangement to include airtight exclusivity.

conclusion in (iv) -- that Hormel's refusal to sell Medina the new retail refrigerated products did not violate Law 75.

The district court's disposition of the summary judgment motions -- and particularly its analysis of the exclusivity issue -- led to a series of motions and orders clarifying what issues remained. In a joint stipulation for dismissal, the parties asserted that the only issues that survived the court's summary judgment order were: (a) "Medina's claim of impairment based on allegations that Hormel refused to sell to it new refrigerated retail products for sale in the Puerto Rico market"; (b) "Hormel's corresponding request for a declaration that Medina does not have a right to purchase new products introduced by Hormel into the market"; and (c) "Hormel's request for damages on grounds of Medina's alleged tortious interference." Stipulation for Voluntary Dismissal Without Prejudice of Count 2 of Amended Complaint and of Counterclaim ("Joint Stipulation for Dismissal"), Docket No. 79, at 1-2. The parties also requested that the court enter final judgment in favor of Hormel on Count I of the amended complaint, which sought a declaration that Medina is the exclusive distributor for Hormel's retail refrigerated products and that Hormel violated the exclusive distribution agreement by selling directly to Costco. Id. at 2.

The district court refused. The court characterized its summary judgment rulings as follows: (i) "Medina's claim[] that

the distribution agreement between Medina and Hormel included sales to mainland distributors was time barred"; (ii) despite this statute-of-limitations finding, there is a genuine issue of material fact as to "whether or not Medina was Hormel's exclusive distributor"; and (iii) there is a genuine issue of material fact regarding "whether or not Hormel's direct sales to Costco violated the distribution agreement." Order for Clarification, Docket No. 85, at 2. Hence, according to the court, the parties' submission that the court rule in favor of Hormel on Count I of the amended complaint -- contrary to (ii) as summarized above -- was tantamount to "asking th[e] [c]ourt to enter a blanket judgment over issues that it has not decided." Id. at 3. In so ruling, the court indicated that Medina's overall exclusivity claim could be separated from airtight exclusivity:

> At no point[] has this [c]ourt determined that Medina is not an exclusive distributor. The only issue that th[e] [c]ourt decided was that Medina was time barred from advancing a claim of airtight exclusivity (airtight exclusivity refers to Medina's claim that Hormel was precluded from selling its products to third parties who resold Hormel products in Puerto Rico).

Id. The court thus ordered the parties to file a joint motion detailing "the issues that they are voluntarily dismissing and how that dismissal impacts Medina's request that the [c]ourt determine that it is Hormel's exclusive distributor, as well as the airtight exclusivity claim." Id. at 4.

The court's order for clarification seems to have exacerbated the confusion regarding the distinction vel non between the court's summary judgment order that any airtight exclusivity claim is time-barred and the court's insistence that Medina's Count I claim over exclusive distributorship (and Hormel's sales to Costco) is not governed by airtight exclusivity. Indeed, in a motion responding to the court's order for clarification, Hormel argued that the district court's statute of limitations ruling disposed of Medina's Count I claim in its entirety because the claim as a whole -- including the claim regarding Hormel's Costco transactions -- is premised on airtight exclusivity. Hormel Foods Corporation's Resp. to Order for Clarification, Docket No. 92, at 4. In a separate motion, however, Medina claimed, seemingly for the first time, that its exclusive distributorship claim in Count I is not time-barred, evidently because the district court itself understood it that way in parsing its own summary judgment order. Mot. in Compliance with Order for Clarification, Docket No. 93, at 1, 4.

With the parties suddenly at odds over the scope of exclusivity alleged by Medina, the district court proceeded with its understanding that Medina's exclusivity claim in Count I could be separated from, and stand independent of, airtight exclusivity. For instance, in responding to Hormel's argument that "it is hard pressed to understand why Medina's claim that it is Hormel's

- 26 -

exclusive distributor is not [also] time-barred," the court noted that this argument was not "properly developed" and, in any event, the court was unable to conclude as much at the summary judgment stage because "the relationship between Hormel and Medina is fraught with difficulty as it was never reduced to writing and must be defined via course of dealing." Mem. and Order, Docket No. 105, at 5 n.1.

As to Hormel's Costco sales, the district court rejected Hormel's argument that its sales of the Supreme Party Platters to Costco Southeast is equivalent to its sales of retail refrigerated products to mainland distributors, and hence the claim regarding the Costco sales is time-barred under the same airtight exclusivity theory. In its post-summary judgment memorandum and order, the court observed that there may be "a distinction between distributors who purchase products on the mainland and then eventually resell those products in Puerto Rico and wholesalers/retailers that have a presence in Puerto Rico and may seek to purchase goods outside of Puerto Rico in an effort to bypass Law 75." Id. at 11. The Costco sales, according to the district court, could fall into the latter category. Id.

## C. Trial

The issues of Medina's exclusivity claim, Hormel's Costco transactions, and Hormel's refusal to sell new retail refrigerated products to Medina all proceeded to a bench trial.

At trial, Medina framed airtight exclusivity as "Hormel's invention and [a] smoke screen to confuse what Medina's position is in relation to Hormel's . . . obligation to protect Medina's exclusivity." Trial Tr., Docket No. 148, at 7. Indeed, Medina argued forcefully and repeatedly that it had "never advanced the position that Hormel cannot sell its refrigerated products . . . to its stateside clients even if they sell them in Puerto Rico." Id. at 9-10.

Instead, what it sought all along, according to Medina, was a recognition that Medina is "the exclusive and sole distributor in Puerto Rico for the Hormel retail refrigerated products." Id. at 8 (emphasis added). As such, the argument went, once Hormel was informed of third-party interference with Medina's exclusivity, Hormel "ha[d] to take an affirmative step" to ensure that those third party distributors ceased such sales and interference with the Puerto Rico market. Id. (citing Gen. Office Prods. Corp. v. Gussco Mfg., Inc., 666 F. Supp. 328, 333 (D.P.R. 1987)). Hormel countered, as it did in pre-trial proceedings, that Medina's exclusivity claim is, in effect, one of airtight exclusivity, and thus the court's earlier statute of limitations ruling barred both Medina's exclusivity claim and its claim regarding the Costco sales.

## D.  District Court's Final Order

The district court changed its view following the trial regarding whether Medina's exclusivity claim can be separated from airtight exclusivity.  Indeed, the court ruled that Medina's exclusive distributorship claim in Count I is time-barred, much as any airtight exclusivity claim was earlier determined to be time-barred, thus indicating that the court now understood Medina's exclusivity claim in its entirety to be inseparable from airtight exclusivity.  Op. and Order on Bench Trial, Docket No. 170, at 37-38.  The court stated, for instance, that the statute of limitations barred Medina's exclusivity claim in its entirety because, "since 1990, Hormel was selling retail refrigerated products to stateside distributors, with the knowledge that these distributors were reselling in Puerto Rico."  Id. at 37.  At the latest, the court further noted, Fielding's July 2005 letter and Ray's January 2006 letter constituted "detrimental act[s]" that triggered the three-year statute of limitations because they confirmed to Medina that Hormel has continued, and will continue, its practice of selling retail refrigerated products to stateside distributors who resell into the Puerto Rico market.  Id. at 36-37.  In light of this statute of limitations ruling, the court found that Hormel's counterclaim -- seeking a declaration that

Medina is not the exclusive distributor of Hormel's retail refrigerated products -- was moot.  Id. at 38.

With respect to Hormel's sales of the Supreme Party Platters, the court found that such direct sales to Costco violated Law 75.  Id. at 42.  Separating Medina's claim regarding Hormel's Costco transactions from its exclusivity claim, the court noted that the Costco claim did not "concern Medina's right to exclusivity," but rather "concern[ed] a specific product that, years after Fielding's letter, was developed by Medina."  Id. at 39. Given "Medina's efforts and knowledge of the Puerto Rico market," which led to the popularity of Hormel's party platters and thereby "greatly benefited" Hormel, id. at 40, the court concluded that Hormel "stranded" Medina when it sold the Supreme Party Platters directly to Costco, id. at 42.  It did not matter, indeed, that the Supreme Party Platters were "not developed with the sole intention of being sold directly in the Puerto Rico stores, and that [they were] sold across all the stores under the Costco Southeast Region."  Id. at 41.  Nor was it relevant that the Supreme Party Platters were shipped to the Costco Southeast distribution center in Atlanta before being sold in the Costco stores in Puerto Rico.  Id.  In light of the "history between Medina and the Costco stores in Puerto Rico," the court found that Hormel was "bound to protect its distributor, and sell through

- 30 -

Medina the <u>upgraded version of a product for which Medina had developed the market</u>." Id. at 41-42.

Finally, the court determined that Medina had "produced no evidence indicating that Hormel was obligated to sell its new products and enter the Puerto Rico market." Id. at 43. Absent such evidence, the court reasoned, Law 75 does not provide for a distributor's right to "dictate whether a particular product will enter the Puerto Rico market." Id. The court ruled, therefore, that "Hormel is not obligated to introduce new retail refrigerated products to Medina once it decides to enter the Puerto Rico market," and that Hormel did not violate Law 75 by refusing to do so. Id. at 44.

The parties cross-appealed the district court's decision.

### III.

On appeal, Medina argues that the district court erred in finding its exclusivity claim to be time-barred. Specifically, Medina claims that the court erroneously relied on Ray's letter from January 2006 as triggering the three-year statute of limitations for Medina's exclusivity claim, even in the face of Ray's deposition testimony that his denial of exclusivity was based only on stateside distributors selling into the Puerto Rico market, not other Puerto Rico-based distributors selling Hormel's retail refrigerated products in Puerto Rico. Relatedly, Medina repeats

the argument that it made at trial that it "never suggested it had (and did not file its claims for) 'airtight exclusivity,'" that airtight exclusivity "is not and never was, the question for the court," and that, in reaching a contrary conclusion, the district court was "side-tracked by Hormel's arguments against 'airtight exclusivity.'" Instead, Medina's "actual claims" of exclusivity, as the party puts it, have to do with "Costco . . . and Medina's right to exclusive distribution in Puerto Rico." Medina also argues that the course of dealing between the parties establishes Medina's status as the exclusive distributor of Hormel's retail refrigerated products in Puerto Rico, and, as such, Hormel's refusal to sell new products to Medina was a detrimental act that violated Law 75.

In its cross-appeal, Hormel contends that the court's imposition of liability for the Costco transactions is inconsistent with its ruling that Medina's exclusivity claim is time-barred. This is so, Hormel argues, because its sales of the Supreme Party Platters to Costco -- which were conducted through Costco Southeast in Atlanta -- is no different from its sales of retail refrigerated products to stateside distributors, and hence Medina's claim regarding the Costco sales is time-barred, much as any exclusivity claim is time-barred. Additionally, Hormel claims that the district court committed a reversible error in declining

to address Hormel's counterclaim that Medina is not Hormel's exclusive distributor.

A district court's legal determinations are subject to de novo review. In re Pharm. Indust. Average Wholesale Price Litig., 582 F.3d 156, 162-63 (1st Cir. 2009); United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001). The court's findings of fact, by contrast, are reviewed for clear error, Williams v. Poulos, 11 F.3d 271, 278 (1st Cir. 1993), meaning that "we will give such findings effect unless, after carefully reading the record and according due deference to the trial court's superior ability to judge credibility, we form 'a strong, unyielding belief that a mistake has been made.'" Id. (quoting Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st Cir. 1992)).

To frame our analysis of the parties' claims, we begin with an overview of Law 75 as it applies to the case at hand.

**A. Law 75**

Law 75 "governs the business relationship between principals and the locally appointed distributors . . . [that] market[] their products." Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 317 (1st Cir. 1999). The statute was enacted to avoid "the inequity of arbitrary termination of distribution relationships once the designated dealer had successfully developed a local market for the principal's products and/or

services."  Id.; see also Twin Cty. Grocers, Inc. v. Mendez & Co., 81 F. Supp. 2d 276, 283 (D.P.R. 1999) (explaining that "[t]he [Puerto Rico] legislature had observed that dealers in Puerto Rico were particularly vulnerable to summary termination once they had established a favorable market for a principal's product" (quoting Draft-Line Corp. v. Hon Co., 781 F. Supp. 841, 844 (D.P.R. 1991))). Hence, Law 75 prohibits principals from engaging in conduct that, directly or indirectly, impairs -- or is "detrimental" to -- the established relationship without just cause.  P.R. Laws Ann. tit. 10, § 278a;[9] Irvine, 194 F.3d at 318 (explaining the scope of § 278a).  By way of illustration, Law 75 enumerates certain detrimental acts that give rise to a rebuttable presumption of an impairment.  See P.R. Laws Ann. tit. 10, § 278a-1.  Those instances include, among others, when a principal "establishes a distribution relationship with one or more additional dealers for the area of Puerto Rico . . . in conflict with the contract existing between the parties."  Id. § 278a-1(b)(2).

---

[9] Section 278a provides:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause.

P.R. Laws Ann. tit. 10, § 278a.

The protection afforded distributors under Law 75, however, is "circumscribed by those rights acquired under the agreement regulating their business relationship." Irvine, 194 F.3d at 318; see also Nike Int'l, Ltd. v. Athletic Sales, Inc., 689 F. Supp. 1235, 1238 (D.P.R. 1988) (noting that Law 75 should not be interpreted to create a "safe-haven for dealers to avoid the express terms of the contracts to which they willingly subscribed"). Thus, "whether or not an impairment has taken place will depend upon the specific terms of the distribution contract." Irvine, 194 F.3d at 318; see also Vulcan Tools of P.R. v. Makita USA, Inc., 23 F.3d 564, 569 (1st Cir. 1994) ("The question whether there has been a 'detriment' to the existing relationship between supplier and dealer is just another way of asking whether the terms of the contract existing between the parties have been impaired."). That is to say, while "non-exclusive distributors are entitled to protection under Law 75," the statute does not "operate to convert non-exclusive distribution contracts into exclusive distribution contracts." Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo, Inc., 96 F.3d 10, 14 (1st Cir. 1996) (quoting Vulcan Tools, 23 F.3d at 569).

The dependency of Law 75's protection on the terms of the contract applies equally to the scope of any protected exclusivity. Law 75 "imposes no prohibition upon the principal of selling or establishing parallel distributorship agreements if he

reserved the right to do so." Gussco, 666 F. Supp. at 331. Hence, where the contract does not prohibit a principal from setting up a parallel distribution in Puerto Rico through stateside distributors, "[t]he clear burden imposed [on the principal] is to deal in good faith with his contracting party and not to impair the established relationship, whatever the relationship is." Id. Where, by contrast, the terms of the agreement provide for exclusivity under which "a supplier agrees to sell its products for resale to a single distributor in a given region," the supplier -- upon being informed of "the interference of a third party in [the distributor's] contractually-acquired exclusive market" -- has an obligation "to take an affirmative step" toward ensuring that such interference stops. Id. at 332, 333; see also Irvine, 194 F.3d at 318 (noting that, where it is undisputed that the distributor had "the exclusive distribution rights of [the principal's] products in Puerto Rico," the principal -- once informed of "market interference by third parties" -- has "the obligation to take prompt positive action to curtail the practice").

All claims arising under Law 75 must be brought within three years of the distributor's being put on notice of "the definitive termination of the dealer's contract, or of the performing of the detrimental acts, as the case may be." P.R.

Laws. Ann. tit. 10, § 278d; see Basic Controlex Corp. v. Klockner Moeller Corp., 202 F.3d 450, 452-53 (1st Cir. 2000).

## B. Exclusivity

The precise terms of their distribution agreement are at the heart of the dispute between Medina and Hormel. In addressing that question, we note that there is an Alice-in-Wonderland quality to this case. That is, Medina faults the district court for construing its exclusive distribution claim as one of airtight exclusivity, even though it allegedly never argued for airtight exclusivity. Yet, Medina did exactly that in its pleadings and throughout the district court proceedings. Hormel also mischaracterizes Medina's position and the district court's decision, arguing, for instance, that Medina's exclusivity claim extends to food service products, when it clearly does not (and never did). Similarly, Hormel claims that the district court ruled that "Medina is not Hormel's exclusive distributor (albeit on grounds that its claims were time-barred)," even though the court plainly declined to address the merits of Medina's exclusivity claim.

Therefore, to make sense of the confusion, we must review the concept of "airtight exclusivity." The term was used by both parties and the district court to denote a type of exclusive distribution arrangement that precludes the principal from selling its products to stateside distributors who in turn would resell

those products in the Puerto Rico market, thereby creating competition for customers in Puerto Rico. Indeed, understanding Medina to be arguing for such exclusivity, Hormel countered in its answer and counterclaim that it has "always asserted its right to sell to customers outside of Puerto Rico without requiring that such customers refrain from reselling in Puerto Rico." Answer and Countercl., Docket No. 4, at 4, ¶ 11. Medina, while not using the term "airtight exclusivity," referred to the same concept in describing its exclusivity claim. It alleged, for instance, that Hormel "has the obligation to inform . . . its customers located outside of Puerto Rico that it has an exclusive distribution agreement with [Medina]," and that they must cease their "tort[i]ous interference" with Medina's exclusivity rights. Answer to Countercl., Docket No. 10, at 2-3, ¶¶ 5-6. Medina also added in its answer to the counterclaims that Hormel's "insist[ence] that it can sell to customer[s] outside Puerto Rico even if they resell all or a portion of its purchases in Puerto Rico" "violat[ed] . . . the exclusive distribution agreement," and that such "parallel lines of distribution into Puerto Rico" are prohibited by Law 75. Id. at 4, 8 ¶¶ 11, 13.

Medina continued to argue for airtight exclusivity at the summary judgment stage and in the proceedings thereafter. Arguing that there is no genuine issue of material fact as to Hormel's violation of the alleged exclusive distribution

agreement, Medina claimed in its summary judgment motion that it "put Hormel on notice of the interference of third parties in [Medina's] exclusive territory, the Puerto Rico retail market, and Hormel did not take measures to protect [Medina's] exclusivity." Medina's Summ. J. Mot., Docket No. 34, at ¶ 4. Medina also added that, "[o]nce informed of the interference, Hormel failed to comply with its legal duty to inform such third parties of the exclusive distributorship relationship it has with [Medina] and did not take measures so that those third parties would not interfere with the Puerto Rico retail market." Id. at ¶ 5. In isolation, it is ambiguous whether the interference by "third parties" cited by Medina in these motions referred to stateside distributors. Yet Medina must mean stateside distributors in light of the course of dealing between the parties and the facts before us.

To be sure, the district court, following its summary judgment order, misinterpreted Medina's exclusivity claim, suggesting that it could somehow be separated from airtight exclusivity. Even then, however, Medina persisted in arguing for airtight exclusivity, even while disavowing that terminology.[10] At

---

[10] We acknowledge that Medina's arguments regarding the scope of its exclusivity became more ambiguous following the court's order for clarification, leading the district court to observe in its final order that "Medina never proffers a definition of what its exclusive distribution contract entails, and simply claims it is Hormel's exclusive distributor." Op. and Order on Bench Trial, Docket No. 170, at 37 n.36. As we conclude infra, however, the

trial, for instance, Medina argued for the first time that "Medina[,] in its amended complaint and pretrial[,] has never advanced the position that Hormel cannot sell its refrigerated products and fresh pork to its stateside clients even if they sell them in Puerto Rico."  Trial Tr., Docket No. 148, at 9.  Yet, Medina's attorney articulated the company's allegedly narrower exclusivity claim -- that it is the exclusive distributor of Hormel retail refrigerated products based in Puerto Rico -- as follows:

> It is Medina's contention, consistent with [Gussco,] that once Medina informs Hormel of the interference of a third party with its acquired exclusivity, Hormel has to take an affirmative step toward acting in accord with its contractual obligation.
>
> . . . .
>
> Medina's position is further validated by the First Circuit case of [Irvine], [which] says -- and I quote -- "Once put on notice that its products are reaching an area of limited distribution rights, a principal has the obligation to take prompt positive action to curtail the practice."

Id. at 8-9.

Nowhere in these statements or others made during the trial did Medina argue, explicitly and specifically, that Hormel's "obligation to take prompt positive action to curtail the practice" applies only to Puerto Rico-based distributors or Costco, and not

context and the substance of Medina's exclusivity argument at trial suggest that it was still arguing for airtight exclusivity.

to stateside distributors.  Indeed, it is more plausible to construe such a claim, articulated in similar language to that used throughout the litigation to present the exclusivity claim, as an invocation of airtight exclusivity.[11]

Moreover, the two cases on which Medina principally relied during the trial -- and the statements quoted from them -- concerned airtight exclusivity.  In Gussco, General Office Products Co. ("General"), a Puerto Rico-based company, had negotiated an exclusive distribution contract with Gussco Manufacturing, Inc. ("Gussco") to be the "exclusive agent and distributor in Puerto Rico" for Gussco's office supplies products.

---

[11] See Medina's Answer to Countercl., Docket No. 10, at 2, ¶ 5 ("[I]t is alleged that Hormel, as principal in an exclusive distribution contract with [Medina], has the obligation to protect the exclusivity granted to [Medina], and therefore, Hormel has the obligation to inform . . . its customers located outside of Puerto Rico that it has an exclusive distribution agreement with [Medina] to have effect in the Commonwealth of Puerto Rico."); id. at 3, ¶ 6 ("It is affirmatively alleged that [Medina], as exclusive distributor of the Hormel refrigerated products for the retail market in the Commonwealth of Puerto Rico[,] has the obligation and right to protect said exclusive distribution agreement against the tort[i]ous interference by third parties and in the exercise of said right has advised the third parties of the existence of the exclusive distribution contract and has requested they cease and desist from interfering with the exclusive distribution contract."); Medina's Summ. J. Mot., Docket No. 34, at ¶ 4 ("[Medina] put Hormel on notice of the interference of third parties in [Medina's] exclusive territory, the Puerto Rico retail market, and Hormel did not take measures to protect [Medina's] exclusivity."); id. at ¶ 5 ("Once informed of the interference, Hormel failed to comply with its legal duty to inform such third parties of the exclusive distributorship relationship it has with [Medina] and did not take measures so that those third parties would not interfere with the Puerto Rico retail market.").

666 F. Supp. at 329.  Pursuant to the exclusivity contract, Gussco wrote to its distributors and retailers that General was "sole distributor for the complete line of Gussco products in Puerto Rico."  Id.  Years later, however, a third party, A.M. Capen's & Sons ("Capen's"), a New Jersey-based corporation, began selling Gussco products -- which it purchased from Gussco itself -- in Puerto Rico.  Id.  General brought a lawsuit against Gussco, asserting that Gussco violated the exclusive distribution contract and Law 75 by refusing to "stop selling to Capen's" or, alternatively, to "not honor orders [from Capen's] destined for the Puerto Rico market."  Id. at 330.  In holding Gussco liable, the district court noted that, while "[Law 75] imposes no prohibition upon the principal of selling or establishing parallel distributorship agreements if he reserved the right to do so," id. at 331, it was the "clear intention" of the parties that the exclusivity cover the entire Puerto Rico distribution, and not be limited in a way that Gussco would simply be prohibited from "contact[ing] or establish[ing] other distributors in Puerto Rico," id. at 332 (emphasis added).  Hence, the court found that, "once General informed Gussco of the interference of a third party in its contractually-acquired exclusive market," Gussco had an obligation to "take an affirmative step toward acting in accord with its contractual obligations" -- by, for example, "making Capen's aware of its market interference and . . . taking measures

- 42 -

so that Capen's would not interfere with the Puerto Rico market." Id. at 333.

Similarly, in Irvine, it was undisputed that IRG, a Puerto Rico-based distributor, had an exclusive distribution contract with Murad, a stateside manufacturer of skin care products, under which Murad agreed "not [to] sell Murad branded products in Puerto Rico thr[ough] any organization other than IRG." 194 F.3d at 316, 318 n.4. Hence, when Murad's products were made available in Puerto Rico through a New York-based cable television station that broadcast an infomercial on Murad's products in Puerto Rico, IRG and Ileana Irvine, the founder of the company, brought a lawsuit against Murad. Id. at 316. In affirming a judgment against Murad, we first noted the undisputed fact that IRG "had the exclusive distribution rights of Murad products in Puerto Rico." Id. at 318. We then reiterated the Gussco principle, stating, "once put on notice that its products are reaching an area of limited distribution rights[,] a principal has the obligation to take prompt positive action to curtail the practice." Id.

Given the context of these cases, Medina's reliance on Gussco and Irvine for the proposition that Hormel has an affirmative duty to stop third parties from interfering with Medina's exclusivity supports the understanding that Medina

- 43 -

maintained its airtight exclusivity claim at trial.[12]   Hence, we

find no error in the district court's treatment of Medina's

exclusivity claim in the pleadings, as well as throughout the

district court proceedings, as one of airtight exclusivity.   We

recognize that the court's change in view -- after having insisted

since the summary judgment order that Medina's exclusive

distribution claim could stand separate from airtight exclusivity

-- is somewhat surprising.   A court's failure to explain its

understanding of a party's claim in full, however, is not, by

---

[12] Medina claims that "[n]o cases under Law 75 contemplate airtight distribution," characterizing Irvine and, by extension, Gussco, as involving instances where the principal sold directly to the competing Puerto Rico-based wholesaler or retailer.   The facts, however, clearly belie this argument.   In Gussco, Gussco sold its products to Capen's, a New Jersey-based distributor, who then sold those products in Puerto Rico.   666 F. Supp. at 329. Likewise, despite the language in Irvine that loosely describes the sales of Murad's products in Puerto Rico as "direct sales," 194 F.3d at 318, the products in question were in fact made available in Puerto Rico through an infomercial broadcast by a New York-based cable television station, id. at 316.   Indeed, these sales cannot be described as "direct" in the way that Medina wants to characterize them because, if they were direct, the question of whether Murad was put on notice of such sales -- which received considerable attention in the court's analysis -- would not have been an issue.   See id. at 318-19.   Finally, we note that Medina's characterization of the two cases on appeal is contrary to how it presented the two cases at trial, where Medina argued that a question the court must answer is "what, if anything, should Hormel do once it is advised by Medina that someone, an ex parte in Miami . . . is buying from Hormel in the states and shipping to Puerto Rico, and that's the Ileana Irvine case and the Gussco case."   Trial Tr., Docket No. 148, at 12 (emphasis added).

- 44 -

itself, an error.[13]  The underlying analytical judgment here is fundamentally sound.

Nor do we find error in the court's statute of limitations analysis.  Despite Medina's express and continuing concerns early on about competition from stateside distributors, it was clear from the beginning of their distribution arrangement that Hormel would sell retail refrigerated products to mainland distributors that resold those products in Puerto Rico.  Indeed, Pepin's complaints in the early years regarding the alleged differential pricing that Hormel gave to mainland distributors confirm this pattern of conduct by Hormel.  See, e.g., J.A. at 82 (Medina complaining in January 1990 that Pueblo had ceased purchasing Hormel refrigerated products because it was buying them at a lower price from Malone & Hyde, a Florida-based distributor).  While we recognize that there is certain language in the parties'

---

[13] The court did indicate, however, that it had earlier believed that "Hormel's letters, and the fact that the claims as to mainland distributors reselling in Puerto Rico were time barred, could not insulate Hormel from further violations if the Court found that exclusivity had been granted to Medina."  Op. and Order on Bench Trial, Dkt. No. 170, at 32 n.32.  However, after examining our decision in Basic, the court determined that, contrary to its earlier thinking, the statute of limitations barred any claim of airtight exclusivity.  Id. at 34-35.  We agree with this understanding of the effect of the statute of limitations.  See Basic, 202 F.3d at 452-54.  Indeed, the bar must operate in this way because any claim that Medina could bring alleging Hormel's later violation of airtight exclusivity would rest on the same argument found to be time-barred -- i.e., that the parties' distribution agreement granted airtight exclusivity.

communications suggesting that Hormel viewed Medina as the "sole" distributor of retail refrigerated products <u>in Puerto Rico</u>, such language appears to have been referring to Medina being the sole distributor <u>based in Puerto Rico</u>. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 110 (Ray stating in a September 2004 letter that Medina "is the sole distributor in Puerto Rico authorized to service [retail refrigerated products]"). That is to say, even if Medina is the exclusive distributor on the island of Puerto Rico, Medina would not prevail here because its exclusivity claim, as we have already determined, is one of airtight exclusivity.[14]

At the latest, moreover, Hormel's responses flatly denying airtight exclusivity in 2005 and 2006 should have put Medina on notice. In August 2005, Pepin wrote to Fielding to request that Hormel "compel [mainland distributors] to cease and desist from interfering with [Medina's] distribution of Hormel products in Puerto Rico by not selling [Hormel's] products in Puerto Rico." Fielding wrote, however, that Hormel "cannot interfere with the legitimate purchase of [its] products in the United States," even if they are re-sold in Puerto Rico. The same is true of the parties' exchange in January 2006 when Medina wrote to complain about Pueblo, a Puerto Rico-based retailer, buying

---

[14] For the same reasons, we do not address here Medina's argument that "sole" is synonymous with "exclusive," and hence it is the exclusive distributor of Hormel retail refrigerated products based in Puerto Rico.

- 46 -

certain Hormel retail refrigerated products from Topco, a stateside distributor. In a letter addressed to Ray, Pepin expressed frustration at Hormel's "disregard [for] [the parties'] distribution contract" and demanded that Hormel "do everything [it] must do to protect [the] exclusive distribution contract." Ray replied, "Contrary to the assertions in your letter, we do not have any written contract with [Medina], or any exclusive distribution agreement." Given this record, we find that Medina's exclusivity claim accrued at least by January 2006, more than three years prior to the filing of this lawsuit on February 3, 2009.

Medina's attempts to persuade us otherwise are unavailing. First, given our earlier holding that Medina's exclusivity claim is one of airtight exclusivity, we can easily dispose of Medina's argument that the district court erred in relying on Ray's 2006 letter as a trigger for the three-year statute of limitations because Ray clarified in a deposition that he was referring to stateside distributors in his denial of exclusivity.[15]

---

[15] In a similar vein, Medina also disputes whether Ray's and Fielding's letters could constitute "detrimental" acts that trigger the statute of limitations under Basic, 202 F.3d at 452-53. Indeed, Medina argues that this case is different from Basic because in Basic it was uncontested that the parties had an exclusive distribution agreement, and the letter that triggered the statute of limitations explicitly stated an intent by the principal to appoint additional distributors, contrary to the existing contract. Id. at 451-52. Here, by contrast, the parties had no written contract, thus requiring the court to rely on a

In addition, to the extent that Medina's exclusivity claim on appeal is any narrower than its exclusivity claim argued below (and thus is not inclusive of airtight exclusivity), see Medina's Reply Br. at 2, 4; Hormel's Reply Br. at 4 (noting that Medina's reply brief "now construes Medina's claims of exclusivity as limited to only barring direct sales by Hormel to wholesalers or retailers within Puerto Rico"), we deem such an argument to be waived. See Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner,

---

course of dealing to discern the terms of the agreement, and there are communications between the parties that allegedly suggest that Medina is the exclusive distributor of Hormel retail refrigerated products in Puerto Rico. These differences, however, are not legally significant. We held in Basic that the distributor "had notice of its claim as soon as [the principal] announced its plan to use other distributors." Id. at 453. The subsequent events -- for instance, whether the principal followed through on its intent expressed in the letter -- were not relevant. Id. at 452. Hence, relying on this interpretation of Basic, we recently held in a case involving exclusivity under Law 75 that a letter that "put[s] [the allegedly exclusive distributor] on notice that [the principal] did not view their relationship as exclusive" constitutes a detrimental act that triggers the three-year time bar. Trafon Group, Inc. v. Butterball, LLC, 820 F.3d 490, 494 (1st Cir. 2016) (emphasis added). The same is true here with Fielding's and Ray's letters.

unaccompanied by some effort at developed argumentation, are deemed waived.").

Accordingly, we affirm the district court's determination that Medina's exclusivity claim in its entirety is time-barred. Additionally, in light of this holding, we -- like the district court -- find that Hormel's counterclaim for a declaration that Medina is not its exclusive distributor is moot.

## C. Hormel's Sales of the Supreme Party Platters to Costco

Despite its time-bar ruling, the district court found that Hormel violated Law 75 by selling the Supreme Party Platters to Costco while bypassing Medina. Hormel argues on appeal that this determination presumes the existence of an exclusivity agreement and is, therefore, inconsistent with the court's finding that Medina's exclusivity claim is time-barred.[16]

We agree. In its amended complaint, Medina argued that "Hormel, <u>in direct and clear violation of the exclusive retail distribution relationship</u> between [Medina] and Hormel, and in further violation of Law 75, developed for [Costco] a Hormel Party Platter, which is being sold directly by Hormel to [Costco], bypassing therefore [Medina] as its exclusive retail distributor

---

[16] Hormel also attacks Medina's Costco claim because it is based on an unwritten contract. It is black letter law, however, that Law 75 does not require an agreement to be in writing for its terms to have legal effect. <u>See</u> <u>R.W. Int'l Corp.</u> v. <u>Welch Food, Inc.</u>, 13 F.3d 478, 483 (1st Cir. 1994); <u>Madelux Int'l, Inc.</u> v. <u>Barama Co.</u>, 364 F. Supp. 2d 68, 74-75 (D.P.R. 2005).

in the Commonwealth of Puerto Rico." Am. Compl., Docket No. 3, at ¶ 10. Consistently, Count I of the amended complaint describes the allegedly exclusive distribution agreement as the basis for Medina's damages claim for Hormel's Costco transactions. See id. at ¶¶ 22-24 (Medina arguing that Hormel's Costco sales violated Law 75 in the same count (Count I) that seeks a declaration that Medina is the exclusive distributor of Hormel's products -- with the Costco sales giving rise to damages, and Medina's claim of exclusivity providing the basis for a declaration). That is to say, the agreement to which Hormel's Costco sales were "detrimental," P.R. Laws Ann. tit. 10, § 278a, according to Medina, was the agreement that Medina claimed was one of airtight exclusivity, see supra Section III.B.

Medina's subsequent arguments corroborate this understanding. Following the district court's summary judgment order, the parties filed a joint stipulation for dismissal, in which they asked the court to enter a final judgment in favor of Hormel on Count I of the amended complaint in light of the court's rejection of airtight exclusivity as time-barred. Joint Stipulation for Dismissal, Docket No. 79, at 1-2. Indeed, Medina, as well as Hormel, understood the court's rejection of airtight exclusivity to have disposed of both the Costco claim and the claim of exclusivity in Count I, stating that the only remaining issues concerned Hormel's refusal to sell new products and Hormel's

counterclaim that Medina engaged in tortious interference by threatening stateside distributors. Id. Additionally, even after the court noted in its Order for Clarification that it had not ruled on either the exclusivity or Costco claim in its summary judgment order, and Medina changed its position to argue that Count I should proceed to trial, Medina continued to characterize its Costco claim as premised on the allegedly exclusive distribution agreement. See Mot. in Compliance with Order for Clarification, Docket No. 93, at 2 (arguing that "genuine issues of material fact exist pursuant to the Order for Clarification . . . []that is, whether or not Medina was Hormel's exclusive distributor and whether or not Hormel's direct sales to Costco violated the distribution agreement[]"); see also Trial Tr., Docket No. 148, at 4 (Medina's counsel noting that the issues for trial are "whether or not Medina was Hormel's exclusive distributor" and "whether or not Hormel's direct sales to Costco violated the distribution agreement").

Because, as Medina argued, its damages claim regarding Hormel's Costco sales is inextricably tied to Medina's claim of exclusivity, we find that its Costco claim also is time-barred.[17]

---

[17] Given our reading of Medina's arguments in the district court, we do not address whether imposing liability for Hormel's Costco transactions would have extraterritoriality implications, as Hormel argues on appeal. Suffice it to say, however, that there would be no extraterritoriality concern insofar as the basis for liability is the principal's violation of obligations it willingly

The district court's imposition of liability for Hormel's Costco transactions is, therefore, reversed.

## D.  New Retail Refrigerated Products

Medina argues that Hormel is obligated to sell new retail refrigerated products to Medina pursuant to the allegedly exclusive distribution agreement.  To the extent that this claim is contingent upon such exclusivity, the claim is time-barred.

undertook.  See Gussco, 666 F. Supp. at 330-31 (noting that "Law 75 has been attacked several times as unconstitutional" based on exclusivity, but has "survived as constitutional" because the statute simply protects the parties' agreement and "does not impose exclusivity of distribution upon manufacturers or suppliers").

Moreover, we recognize that the district court appeared to have in mind a theory of liability that did not depend on exclusivity, i.e., that liability could be imposed under Law 75 regardless of exclusivity because Medina had "built up" the market for Hormel's party platters in Costco's Puerto Rico stores.  Op. and Order on Bench Trial, Docket No. 170, at 40 (quoting Medina & Medina v. Country Pride Foods, 825 F.2d 1, 2-3 (1st Cir. 1987)).  We express no view on that theory.  See Caribe Indus. Sys., Inc. v. Nat'l Starch & Chem. Co., 212 F.3d 26, 28-29, 31 (1st Cir. 2000) (declining to address a district court's reasoning that "no cause of action lies under Law 75 where a principal sells directly to a customer of a non-exclusive dealer").  In addition, we acknowledge that there could be a distinction between Hormel's Costco sales and its sales to stateside distributors who resell into the Puerto Rico market. That would be so if Costco Southeast, which Hormel analogizes to a stateside distributor, was instead -- as Medina now contends -- the customer for the party platters distributed in Puerto Rico.  Indeed, if Costco Southeast was Medina's customer, and Medina had proved it was Hormel's exclusive distributor in Puerto Rico, the district court's reasoning -- that Hormel left Medina "stranded" by selling directly to Costco Southeast -- may have had merit.  Op. and Order, at 42.  But, as explained above, the only Costco-related claim that Medina asserted in the district court was premised on the asserted agreement of airtight exclusivity.

- 52 -

See, e.g., Medina's Am. Compl., Docket No. 3, at ¶ 26 ("Hormel's illegal conduct by refusing to sell [Medina] the new refrigerated retail products, as it historically did in accordance with the exclusive distribution agreement, . . . is an illegal action, contrary to Law 75, and the existing exclusive distribution agreement."). We agree with the district court, moreover, that Medina has "proffered no evidence proving that Hormel obligated itself to sell to Medina every new retail refrigerated product[] developed," Op. and Order on Bench Trial, Docket No. 170, at 44, or that Hormel used another Puerto Rico-based distributor to sell such new products, see, e.g., P.R. Laws. Ann. tit. 10, § 278a-1(b)(2) (providing that a rebuttable presumption of an impairment occurs when a principal "establishes a distribution relationship with one or more additional dealers for the area of Puerto Rico . . . in conflict with the contract existing between the parties"). We thus find that Medina is not entitled to compel Hormel to sell new retail refrigerated products and that Hormel cannot be held liable for refusing to do so.

## IV.

For the foregoing reasons, we conclude that the three-year statute of limitations bars Medina's exclusivity-based claims and, contrary to the district court's determination, we hold that the time bar extends to the sale of Costco party platters. In all

other respects, the district court properly resolved the parties' claims.

Hence, as to the issues raised in Medina's appeal (No. 14-2055), we affirm the judgment of the district court. As to the issues raised in Hormel's cross-appeal (No. 14-2066), we reverse that portion of the district court's decision finding Hormel liable for the Costco sales and otherwise affirm the court's judgment.

So ordered. Costs to Hormel.